THE STATE ex rel. ARTHUR V. LASHLY v
CHARLES U. BECKER, Secretary of State.

In Banc, December 7, 1921.*

1. **ORIGINAL PROCEEDING**: Things Considered. An original pro-
ceeding in mandamus involving practically the whole organic law
of the State calls for all legal information possessed by either
court or counsel, and if necessary to a right conclusion the court
will consider points outside of the briefs.

2. **SENATORIAL DISTRICTS**: Legislative Action. A division of
the State into senatorial districts by the Governor, Secretary of
State and Attorney-General is an act legislative in its character,
made so by the Constitution, which first grants the power to the
General Assembly, and upon its failure or refusal to act grants the
same power to these three state officials, who but for such grant
would possess no legislative duties or functions. [Following State
ex rel. Barrett v. Hitchcock, 241 Mo. 433.]

3. ————: Power of Executive Officers Since Initiative Amendment:
Stare Decisis. The question involved in this case, namely, the
power of the Governor, Secretary of State and Attorney-General,
in view of the initiative-and-referendum amendment of the Con-
stitution, to divide the State into senatorial districts upon the re-
fusal or failure of the General Assembly to do so, has never been
before the Supreme Court for decision, nor can the case of State
ex rel. Halliburton v. Roach, 230 Mo. 408, nor the case of State
ex rel. v. Patterson, 229 Mo. 373, be held to be *stare decisis* of
the question, for it was not involved in the questions decided
by those cases, and besides it is doubtful if the Halliburton case
has any further binding force in view of the later decision in State
ex rel. Stokes v. Roach, 190 S. W. l. c. 279. In the Halliburton
case the question decided was that an initiative petition demand-
ing that an amendment to the Constitution dividing the State into
senatorial districts be submitted to the people for their approval
or rejection does not in fact ask for an amendment to the Con-
stitution, but for a statutory enactment by popular vote, and that
a temporary statute could not be enacted under the guise of a

*NOTE:—Majority opinion by GRAVES, J., and separate opinion by
ELDER, J., filed December 3, 1921; motion for rehearing filed December
6th; motion overruled December 7th; dissenting opinion by DAVID E.
BLAIR, J., filed December 8th; dissenting opinion by HIGBEE, J., filed
December 9th; concurring opinion, in response, by JAMES T. BLAIR, C. J.,
filed December 16, 1921.

State ex rel. Lashly v. Becker.

constitutional amendment; and the question whether the conditional grant of power to said three executive officers to redistrict the State senatorially upon the failure of the General Assembly to do so had been withdrawn by the initiative-and-referendum amendment of 1908 was not an issue, and consequently could not have been decided.

*Held*, by ELDER, J., in a separate opinion, and by DAVID E. BLAIR and HIGBEE, JJ., in separate dissenting opinions, that it was squarely decided in the Halliburton case that the power to redistrict the State into senatorial districts was and is, by Section 7 of Article IV of the Constitution, specifically and exclusively delegated in the first instance to the General Assembly, and, in the event of its failure to perform the duty, to the Governor, Secretary of State and Attorney-General, and that this power being still specifically so delegated was not withdrawn by the initiative-and-referendum amendment of 1908, nor its exercise changed, modified or affected by the adoption of said amendment, and that it could not thereafter be exercised by any authority other than those to whom it had thus been delegated by said Section 7.

*Held*, by JAMES T. BLAIR, C. J., in response, that the language of a former decision is to be construed with reference to the circumstances of the particular case and the question actually under consideration and decided; that the language, arguments and illustrations used by a judge in his opinion are to be interpreted in the light of the facts and issues held in judgment in the concrete case, and that general language cannot be mechanically or automatically applied to different issues and different facts in another case; that the question whether the conditional grant of legislative power to the Governor, Secretary of State and Attorney-General to divide the State into senatorial districts was withdrawn by the initiative-and-referendum amendment was not an issue in the Halliburton case, as is shown by the clear statement in the opinion therein of the two questions up for decision; that the real question decided by that case was that the amendment gave the people no power by initiative petition to propose a constitutional amendment which the Legislature could not have proposed; and that the decision of this question was in no wise affected by the question whether the power of the three executive officers remained or had been abrogated.

4. **CONSTITUTION: Amendment: Inconsistency.** An amendment will prevail over an inconsistent provision in the original constitution, and its operation or effect cannot be controlled or limited by prior constitutional provisions in conflict with it.

290 Mo.—36

5. ———: ———: **Construction.** A fair interpretation of the language used, having in view the fundamental purpose to ascertain and give effect to the intention of the framers of the Constitution, including the amendment, if such there has been, is a rule of construction. The construction should not be technical, strict or liberal, but a fair interpretation, having in full view the intent of the framers.

6. ———: **Amendment of 1908: Annullment of Other Provisions: Senatorial Districts: Construction: Repeal By Implication.** The initiative-and-referendum amendment of 1908 of the Constitution practically wiped out Section 36 of Article IV, giving to the General Assembly power over emergency clauses, and the word "only" in Section 1 of Article XV declaring that "this Constitution may be amended and revised only in pursuance of the provisions of this chapter," and the proviso or last clause of Section 7 of Article IV, declaring that "if at any time, or from any cause, the General Assembly shall fail or refuse to district the State for senators, as required by this section, it shall be the duty of the Governor, Secretary of State and Attorney-General, within thirty days after the adjournment of the General Assembly on which such duty devolved, to perform such duty;" and all legislative power was by said amendment vested in the General Assembly, with the reserved power in the people to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, and by referendum to approve or reject at the polls any act of the General Assembly.

*Held*, by ELDER, DAVID E. BLAIR and HIGBEE, JJ., dissenting, in separate opinions, that if so much of said Section 7 as empowers the Governor, Secretary of State and Attorney-General to divide the State into senatorial districts, upon the failure of the General Assembly to do so, was repealed by said amendment, it was repealed by implication; that it is a cardinal rule of both constitutional and statutory construction that repeal by implication is not favored; that to establish a repeal the said amendment and said provision in Section 7 must be plainly and irreconcilably repugnant to each other; that there is no such repugnancy; that said amendment spent its force on the provisions for the initiative and referendum, and did not expressly or by intendment, re-invest, or change or alter the investment of, legislative power; that said amendment was intended and designed to afford the people (a) a means of enacting desired legislation which the General Assembly would not enact, and (b) to override an objectional "act of the legislative assembly," to which the referendum alone applies; and that said amendment should not be extended by construction

to embrace a withdrawal from said executive officers of the conditional grant of power with which they had been previously invested.

7. ———: ———: **Restrictions Upon Legislative Power.** The subject of the initiative-and-referendum amendment of 1908 was the grant of legislative power, not restrictions upon legislative action. It did not deal with restrictions upon the right, power or authority of the General Assembly, but it embraced its acts of omission and commission. The Bill of Rights withholds certain subjects from legislative action, and there are reservations or restrictions upon legislative action found in other articles, none of which are impaired by the amendment; it withdrew no legislative power; it simply centralized the legislative power or authority in the General Assembly, excluding its exercise by other independent department or officers of the government, and reserving the right to refer, if the General Assembly acted, and to initiate, if it did not act. The "legislative authority" mentioned in the amendment must be construed as meaning such legislative power or authority as was not reserved or restricted by the amendment itself and by such provisions of the existing Constitution as are not in conflict with it. The purpose of the amendment was to secure to the people the rights of referendum and initiative upon all legislative subjects, and things reserved to them or restricted by them are not legislative subjects.

*Held,* by ELDER, J., in a separate opinion, and by DAVID E. BLAIR and HIGBEE, JJ., in separate dissenting opinions, that if said amendment withdrew all legislative power from the General Assembly and re-invested it in a legislative assembly, subject to the right of popular referendum and initiative, it struck out of the Constitution all limitations and restrictions upon the authority of the Legislature, and withdrew all prior constitutional grants of legislative authority to cities and agencies other than the General Assembly, and all prior delegation of legislative power made by the General Assembly itself; that such conclusion and revolutionary result is compelled, if the amendment withdrew the conditional grant of legislative power to the three executive officers to divide the State into senatorial districts theretofore invested in them by Section 7; that all the amendment attempted or accomplished was a reservation of power to require approval by the people of certain enactments of the General Assembly, and to initiate and enact laws that the General Assembly might fail to pass and to amend the Constitution; and, hence, restrictions and limitations upon and grants of legislative power provided elsewhere in the Constitution were not affected, and the grant to

the three executive officers to divide the State into senatorial districts upon the failure of the Legislature to do so was not therefore withdrawn or affected by it.

*Held,* by JAMES T. BLAIR, C. J., concurring, that unless it be true that the power exercised by a city council in enacting ordinances, and the delegated power exercised by a legislative agent, such as the Public Service Commission, is a part of the legislative power in a constitutional sense, the delegations of power to municipal corporations and legislative agents are not invalid or unconstitutional; that there is .no conflict between that clause of the amendment which declares that ''the legislative authority of the State shall be vested in a legislative assembly'' and the authority conferred by the General Assembly upon a city council to enact ordinances for the city, for the conferring of such authority upon cities is not a delegation of the law-making power of the government; that the General Assembly cannot delegate its law-making power or its legislative authority, but the city's authority to enact ordinances is not an exercise of legislative power in the constitutional sense; the power to authorize municipalities to act in matters of local concern, and the power to establish a public service commission or other board for the better administration of the law regulating public utilities, are consistent parts of ''the legislative authority'' expressed in the amendment, but it no more repeals or affects those powers, or acts passed in pursuance to them, than it repeals or affects acts passed under any other part of the legislative power as it existed under the Constitution at the time the amendment was adopted; that the amendment invested all legislative power in the General Assembly, subject to referendum and initiative, but it did not affect any existing constitutional restrictions or reservations; that by declaring that ''the legislative authority of the State shall be vested in a legislative assembly,'' subject to the right of the initiative and referendum, the amendment withdrew from the three executive officers the legislative power to form senatorial districts, but it did not thereby withdraw, or destroy or affect existing restrictions upon the legislative power of the General Assembly.

8. ———: ———: **Veto Power of Governor.** The initiative-and-referendum amendment of the Constitution did not destroy the veto power of the Governor. Whether the veto power be considered as legislative or executive, the amendment confines legislative action in a single forum, so that the people would have the full power of initiative and referendum, and this single forum includes all officers whose acts are required to complete or defeat a law; if the Governor is a part of the legislative power, it includes him; if he

State ex rel. Lashly v. Becker.

is not, his veto power is preserved by the amendment itself, which declares that "the veto power of the Governor shall not extend to measures referred to the people." If an act passed by the General Assembly is vetoed by the Governor, it can still be referred to the people, if again passed by the General Assembly in spite of his veto, but if referred to and approved by the people he cannot again veto it; as to laws enacted by the initiative process his veto power cannot be exercised.

*Held*, by DAVID E. BLAIR and HIGBEE, JJ., in separate dissenting opinions, that said amendment did not concentrate all legislative power in a single forum, but left such power, except as to the right of referendum and initiative, where it had previously existed.

——: ——: **All Legislative Authority: Senatorial Districts.** The amendment of 1908 in declaring that "the legislative authority of the State shall be vested in a legislative assembly consisting of a senate and a house of representatives," followed by provisions reserving to the people the right to refer legislative acts and to initiate laws, vested in one single forum all legislative authority, and took away from the three executive officers the conditional grant of legislative power to divide the State into senatorial districts. [ELDER, DAVID E. BLAIR and HIGBEE, JJ., dissenting, in separate opinions.]

10. ——: ——: **Investment of Legislative Power: Conditional Grant to Executive Officers Withdrawn.** The initiative-and-referendum amendment of 1908 declaring that "the legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and a house of representatives," and reserving to the people both the right to refer and to initiate, precludes any conclusion that any portion of legislative authority belongs elsewhere. It annulled the conditional grant of legislative power theretofore vested in the Governor, Secretary of State and Attorney-General to divide the State into senatorial districts upon the failure or refusal of the General Assembly to do so. It gave to the people the right to initiate legislation dividing the State into such districts, and it gave the right to have referred to them any act of the General Assembly making such division, and it thus took away from these three executive officers the conditional grant of legislative power theretofore vested in them. [ELDER, DAVID E. BLAIR and HIGBEE, JJ., dissenting, in separate opinions.]

11. ——: **Formation of Senatorial Districts: Act of 1901: Invalidity.** If it be conceded that the Act of 1901 by which the Governor, Secretary of State and Attorney-General divided the State into senatorial districts was invalid, that concession does not avail a respondent who does not attack the validity of the Act of 1891,

by which the same counties were placed in the senatorial district in which relator resides as were placed therein by the said Act of 1901 and have ever since constituted said district; for if it be conceded that the division made by the three executive officers in 1901 was invalid, respondent would be relegated to the division made in 1891, which is not questioned.

12. ——: ——: ——: ——: **Timely Attack: Laches.** The division of the State into senatorial districts in 1901 by the three executive officers having remained unchallenged for more than twenty years, and being in its nature largely political and administrative and involving no individual rights other than pertain to the whole electorate, and to hold it invalid would result in the utmost confusion, a litigant will not be heard at this late date to question its validity. In such case the question whether laches can give validity to a void act will not be decided, but the act being purely administrative or political, individuals who have seen it in operation and unchallenged for a long series of years will not be heard to question its validity.

## Mandamus.

WRIT GRANTED.

*Wilfley, Williams, McIntyre, Hensley & Nelson, A. T. Dumm, Henry L. Jost, John T. Barker, T. R. R. Ely, Wayne Ely* and *John I. Williamson* for relator.

(1) Section 7 of Article 4 of the Missouri Constitution is repealed by Section 57 of Article 4, and the redistricting by the Governor, the Secretary of State and Attorney-General is void. 8 Cyc. 749; People v. Angle, 109 N. Y. 564, 17 N. E. 413; 12 Corpus Juris, 724; Board v. County, 58 Fla. 391, 50 So. 574; 36 Cyc. 1073; Pool v. Brown, 98 Mo. 675; Maxwell v. Dow, 176 U. S. 602; State ex rel. v. Hitchcock, 241 Mo. 433; State ex rel. Westhues v. Sullivan, 224 S. W. 327; Sears v. Multnomah Co., 49 Ore. 43; Arksansas Tax Comm. v. Moore, 103 Ark. 53; In re Interrogatories by Governor, 181 Pac. (Colo.) 197. (2) This attempt at redistricting is so unfair, both as to equality of population and compactness of territory, as to make it void. State ex rel. v. Hitchcock,

241 Mo. 433; Secs. 5, 6, 9, Art. 4, Mo. Constitution; 36 Cyc. 846-848; Donovan v. Comrs., 225 Mass. 55, 2 L. R. A. 1344; State ex rel. v. Cunningham, 81 Wis. 440, 15 L. R. A. 561; Denny v. State, 144 Ind. 403, 31 L. R. A. 726; People v. Thompson, 155 Ill. 451; Brooks v. State, 162 Ind. 568; Ragland v. Anderson, 125 Ky. 141, 100 S. W. 865; Atty. Gen. v. Comrs., 224 Mass. 598; Giddings v. Blacker, 93 Mich. 1, 16 L. R. A. 402; Williams v. State, 145 Mich. 447; Stevens v. State, 181 Mich. 199; State ex rel. v. Stoddard, 25 Nev. 452, 51 L. R. A. 229; Baird v. County, 138 N. Y. 95, 20 L. R. A. 81; Re Timmerman, 100 N. Y. Supp. 57; Moore v. New York, 160 N. Y. Supp. 471; Williams v. Woods, 162 S. W. 1031; State ex rel. v. Cunningham, 83 Wis. 90, 17 L. R. A. 145; Re Dolling, 219 N. Y. 44; Sherrill v. O'Brien, 188 N. Y. 185; Re Livingston, 160 N. Y. Supp. 462. (3) Respondent is estopped to question the validity of the apportionment of 1901. Adams v. Bosworth, 126 Ky. 61; Ragland v. Anderson, 125 Ky. 141; In re Reynolds, 202 N. Y. 439; State ex rel. v. Howell, 92 Wash. 540.

*Jesse W. Barrett,* Attorney-General, and *Merrill E. Otis,* Assistant Attorney-General, for respondent.

(1) The initiative-and-referendum amendment did not repeal Section 7 of Article IV. of the Constitution. State ex rel. Halliburton v. Roach, 230 Mo. 408. (2) Repeatedly since the adoption of the initiative-and-referendum amendment the Supreme Court has recognized that Section 7 of Article IV is still in force. State ex rel. Halliburton v. Roach, 230 Mo. 408; State ex rel. v. Hitchcock, 241 Mo. 457; State ex rel. v. Patterson, 229 Mo. 388. (3) To say, as relator does, that the initiative-and-referendum amendment removed from the Constitution all limitations on and exceptions to the legislative authority of the General Assembly leads to an absurdity, namely, the elimination from the Constitution of the multitude of important limitations on the power of the Legislature, including the thirty-three set out in Section 53 of

Article IV, and the Governor's veto power, which is an essential part of the legislative authority of the State. (4) The initiative-and-referendum amendment must be read in the light of the great rules of constitutional and statutory construction: (a) All parts of the Constitution are to be read together; (b) when of two possible constructions of a particular provision one is in harmony with and the other repugnant to another provision, dealing with the same subject, the first must be adopted; (c) the presumption is against repeal by implication. When so read, the language of the amendment —"the legislative authority of the state"—can only be construed to mean the legislative authority as elsewhere in the Constitution delegated to the General Assembly, subject to all the limitations and exceptions in the Constitution stated. (5) If there is a doubt as to whether the amendment repeals Section 7 of Article IV (and at least that such a doubt exists appears from the decision of the Supreme Court and the numerous declarations of the judges thereof that Section 7 of Article IV was not repealed by the amendment), then we may look to the history of the amendment to ascertain the actual intent of the people in adopting it. That history shows that the repeal of Section 7 of Article IV was never contemplated or suggested. (6) The redistricting of 1921, being a legislative act, is presumed to be constitutional. (7) The redistricting of 1921, both as to compactness and equality of population is greatly superior to those of 1881, 1891, 1901 and the 1911 attempted redistricting. The fact that a redistricting is superior to any ever before laid out by reasonable men shows that it is at least a reasonable approach to the standards fixed in the Constitution. (8) The redistricting of 1921, both as to compactness and equality of population, is greatly superior to that of the Constitution of 1875 itself as that redistricting appears in Section 11 of Article IV. That redistricting is a proper measuring rod. That redistricting must be presumed to have satisfied the constitutional standards. *A fortiori* a better redistricting is constitu-

tional.  (9)  The redistricting of 1921 is the best that can be made.  The districts thereof are as nearly compact and equal in population as may be.  (10)  To set aside the 1921 redistricting is to continue that of 1901, which grossly departs from the constitutional standards. The Supreme Court will not exercise jurisdiction when that is the inevitable result.  State ex rel. v. Hitchcock, 241 Mo. 516.  (11)  As a necessary element in his cause of action relator alleges the validity of the 1901 redistricting.  The return puts that in issue.  The 1901 redistricting patently departs from the constitutional requirements.  In no event, therefore, is relator entitled to a mandamus.

*Jesse W. Barrett*, Attorney-General, and *Merrill E. Otis*, Assistant Attorney-General, for respondent, in supplemental brief:

(1)  Section 10 of Article X of the Constitution directs the vesting of most important legislative authority (that of levying taxes), in the corporate authorities of counties, cities and towns.  Elsewhere in the Constitution like legislative authority is required to be delegated to school districts.  If the initiative-and-referendum amendment constituted a revesting of all legislative authority, with no provision for the delegation of any part thereof (and there is none), then Section 10 of Article X has been repealed by implication.  (2)  If, as relator says, the people in 1908 first resumed all of the legislative authority they had originally conferred on the General Assembly and others and then vested that legislative authority but this time only in the General Assembly, then the amendment unquestionably supersedes, not only the proviso in Section 7, but all of Section 1 of Article IV.  Why leave in the Constitution the section which contained the original vesting of legislative authority, when that original vesting has been withdrawn?  Then Section 1 also has been repealed, including the clause, ''subject to the limitations herein contained,'' for that clause was

but a qualification of the power bestowed and with the withdrawal of the power, the qualification, of course, ceases to have meaning. The result is that the relator is forced back to his original and discarded theory, namely that when the people, as he says, having resumed the power theretofore bestowed, again vested it, they vested it without any limitation whatsoever. (3) If the amendment is read (as it should be if we obey the great rules of constitutional and statutory construction) in connection with the rest of the Constitution there is no difficulty. Then the meaning of "the legislative authority of the State" will be seen to be the legislative authority of the State not otherwise delegated in the Constitution and subject to all the limitations and exceptions in the Constitution stated. Moreover, the true purpose of the initial language of the amendment becomes then apparent. It is merely a conjunction joining the substance of the amendment to the original constitution, equivalent to saying "while the legislative authority shall remain as hitherto, the people now provide a method for direct legislation on their own part and for the referendum." It is perfectly plain from the whole amendment that there was no intention to recast the old Constitution, but merely to add something to it. If there had been any intention whatever of subjecting the redistricting authority of the three executive officials to the referendum, it could have been accomplished by simply saying that every "legislative act" shall be subject to the referendum, instead of applying it only to every "act of the Legislature." How absurd to attempt to accomplish an end, which could have been reached so easily, by the cumbrous, vague, indirect and obscure method of first resuming all legislative authority and then revesting it!

*Wilfley, Williams, McIntyre, Hensley & Nelson, A. T. Dumm, Henry L. Jost, John T. Barker, T. R. R. Ely, Wayne Ely* and *John I. Williamson* for relator, in reply.

(1)   We have corrected Point I of our original brief, so as to limit its application to the power formerly pos-

sessed by the Governor and his associates as to districting the State. Of course, as the body of the brief clearly shows, we never contended that Section 57 repealed all of Section 7. (2) We have never contended that Section 57 repealed any prohibition contained in the Constitution whereby the Legislature is forbidden to exercise certain legislative power. We claim that all of those prohibitions are absolutely unaffected by Section 57. We restate our position solely because of the statement made in respondent's brief that we did claim that these limitations were repealed. (3) Respondent has in his brief an oral argument virtually confessed that our Point One is right. He admits that so much of Section 7 as confers any power upon the Governor and his associates is a grant and not a limitation. But since Section 57 reassigns and relocates all of "the legislative authority of the State," and does not bestow any part of it upon the Governor and his associates, they have no legislative power or authority, and hence cannot perform the legislative act of redistricting the State. Even on the theory that the phrase "the legislative power" in Section One is the exact equivalent or is used in the Constitution as synonymous with "the legislative authority of the State," as used in Section 57, we are still entitled to judgment, for these reasons: No one can for an instant contend that all legislative power was, by the Constitution of 1875, vested in the General Assembly and in the Governor or his associates. All of the large number of legislative powers the use of which is prohibited to any one by the Constitution are excluded from the grant of power to the General Assembly and to the Governor and his associates. This exclusion is effected by the clause "subject to the limitations herein contained" in Section 1. It follows beyond doubt, then, that only so much legislative power was granted as remained after the excluded or prohibited legislative powers were deducted or subtracted from all legislative power, using that phrase in its broadest sense. Clearly this remainder of legislative power is all that ever was vested by the Constitution of 1875 in the Gen-

eral Assembly and in the Governor and his associates. If, then, the phrase "legislative power" as used in Section 1 is held to embrace only this remainder, then, even if the phrase "legislative power" as used in Section 1, be construed as the exact equivalent of the phrase "the legislative authority of the State" as used in Section 57, it necessarily follows that the constitutional prohibitions upon the use of certain legislative powers remain absolutely untouched, notwithstanding Section 57, as we insist they do. But since Section 57 vests all of this remainder of legislative power, or authority, in the Senate and House of Representatives (subject to the reservation of the rights of initiative and referendum to the people), there is still no legislative power in the Governor and his associates, and they cannot redistrict the State. Respondent may take whichever horn of this dilemma he chooses. Relator should prevail in either event. (b) The words "the legislative authority of the State" in Section 57 embrace all legislative power theretofore granted by Article 4 to the General Assembly and to the Governor and his associates, and they do not confer any other or additional legislative power or authority, and hence the legislative powers excluded by the Constitution of 1875 are still excluded. Since the grant in Section 57 does not include the Governor and his associates, the power theretofore granted them by Section 7 is taken away. (4) Respondent's contention cannot be true, for it leads to absurd results. If his contention is true, the people, by the right of initiative, can redistrict the State; the General Assembly can redistrict the State, and (if it fails to act) the Governor and his associates can redistrict the State. Three separate legislative bodies thus have power to do the same act, to-wit, the people, the General Assembly and the miniature legislature. (5) Another absurd result of respondent's contention is this: By Section 57, the people undoubtedly have power to refer for their own approval or rejection, a redistricting made by the General Assembly. This is an evidence of popular distrust of the General Assembly. But the

people cannot refer a redistricting made by the "miniature legislature" because the power to refer contained in Section 57 applies only to "any act of the legislative assembly" and in Section 57 the legislative assembly is defined as "consisting of a senate and house of representatives." But the senate and house of representatives are given the power first to act in redistricting. Under respondent's theory, the people reserved the power to review the acts of representatives and 34 senators, but reserve no such right as to the act of the Governor, Secretary of State and Attorney-General. That no such absurdity was intended by the people is evidenced by the fact that by Section 57 all legislative power is taken away from the three officials named. Another reason for that deprivation of power may be found in the fact—if it be a fact—that, according to respondent's distinguished counsel, every exercise of this power by every Governor, Secretary of State and Attorney-General had been a glaring abuse of power.

GRAVES, J.—Original case in mandamus. The relator, according to both petition and return, is duly qualified to be elected as a member of the proposed and approaching constitutional convention. He has been duly nominated for such delegate by the Democratic party as a candidate for such place by the Democrats of the 25th State Senatorial District of the State, as such district has existed from 1901 up until the present Governor, Attorney-General, and Secretary of State, since the adjournment of the last regular session of the Missouri General Assembly (session beginning in January, 1921) subdivided the State into 34 State Senatorial Districts. The return attacks the legality of the redistricting in 1901, but does not attack the one of 1891. The 25th State Senatorial District was the same, both under the action taken in 1891 and that of 1901. By both actions the 25th State Senatorial District was made up of the counties of Franklin, Gasconade and St. Louis. In fact, the counties of Franklin, Gasconade and St. Louis

were placed in the 25th Senatorial District by the Constitution of 1875, and remained there until 1881, when Franklin was cut out, and Jefferson inserted. [Mo. Constitution (1875), Art. IV. sec. 11.]   In 1891 the constitutional district was re-established and has since remained until the action in 1921.

By the action of the present Governor, Secretary of State and Attorney-General, on April 16, 1921, the 25th State Senatorial District was so made as to include only the counties of Dunklin, Mississippi, New Madrid, Pemiscot and Scott.  If this apportionment and redistricting is valid, the relator is not even a resident of such district.  He lives in the County of St. Louis, in the old 25th District.  After receiving his nomination from the 25th District Democrats, as such district has existed since 1891, he offered to file his certificate of nomination with Hon. Charles U. Becker, the present Secretary of State and respondent herein, who refused to file the same.  For such action no personal or official blame can attach to the action of this officer.  The legality or illegality of the redistricting in 1921 was a court question, and by his act he properly left it to a court decision.  The pleadings bespeak the utmost fairness of distinguished counsel upon both sides.  They have sheared the case of all rubbish, so that the questions of decision are few and simple.  They are: (1) were the present three state officials above mentioned authorized or empowered to redistrict the State in 1921 under the Constitution as it now stands; (2) if they were so authorized and empowered, have they followed the mandate of the Constitution in so doing; and, as contended by respondent, (3) was the action taken in 1901 (in redistricting the State) pursuant to the constitutional mandate?  Other details can best be considered in the opinion.

I.   Simplicity and candor should mark every statement in this case.  This, because of the settings which surround it.  The real picture should not be dimmed

by mere abstruse statements or unwarranted
**Important** assertions. The case is of too much import-
**Original** ance for such things. The law, and the law
**Proceeding:** only, should prevail. That law should be
**Things**
**Considered.** stated with such directness and simplicity that
he who runs may read, and, in addition, could
understand. The responsibility rests upon the court, and
not upon counsel, who have, with marked ability, present-
ed their views of the case. The case practically involves
the whole organic law of the State, under the suggestion
made in some of the briefs. This has occasioned a read-
ing and several re-readings of the historic document of
1875. This has been a work of pleasure, as well as of
profit to the writer. If, therefore, we step beyond the
argued points of briefs upon either side, we will be
pardoned. The argued points are limited, but the side
suggestions are varied. But be that as it may, this is
an original case in this court, and it calls for all the
legal information possessed by either court or counsel.
So much in advance of the opinion.

II. We need not debate the character of the act
performed by the three state officers. It is legislative
in character, pure and simple. Section 7 of Article IV of
the Constitution so classifies it, because this
**Legislative** section first grants the power to the General
**Act.**
Assembly. Upon its failure to act, it grants
the same power to three officials, who, but for this grant of
power, would possess no legislative duties or functions.
This court has so ruled. [State ex rel. Barrett v. Hitch-
cock, 241 Mo. 433.] All three opinions in that case so rule.
Counsel for respondent here have undertaken to press
argumentative excerpts from the views of VALLIANT, C. J.,
and GRAVES, J., in that case in support of his claims here.
Suffice it to say that when those opinions are carefully
read it will be discovered that they rule but one single
question. VALLIANT, C. J., at the very outset carefully
worded the question for solution, and the question solved

by the two concurring opinions. At page 511 of 241 Missouri Report he said:

"The question on the threshold is, has this court jurisdiction of the case stated in the pleadings? Counsel for respondents in their brief say: 'This is a proceeding by mandamus to test the validity of an apportionment of the State into senatorial districts contained in a certain statement of the districts filed in the office of the Secretary of State on April 18, 1911.' That is doubtless the purpose of the suit, but if this court has no jurisdiction of the case it cannot pronounce judgment on the point in dispute and therefore anything that we might say on the subject would be simply the opinion of individuals."

Later these two opinions announce the reason that we had no jurisdiction. The reason was that the circuit judges sought to be mandamused were acting in a legislative capacity and not in a judicial capacity; that this court had no power to act in such a case. The writer, following the views of VALLIANT, C. J., used this language:

"The legislative function cannot be regulated by judicial action. We cannot compel legislative bodies to act, nor can we enjoin them from acting. This is a subject-matter beyond the jurisdiction and power of this court. When we are asked to either mandamus or enjoin a legislative body, the only reply we can make, is, that, under the Constitution, the subject-matter is beyond our jurisdiction. That is what should be done in this case and what is done by both opinions. Then why discuss a lot of questions in a case over which we have no jurisdiction? Why say the case is one over which we have no jurisdiction, and yet proceed to pass upon the alleged merits? Such discussion decides nothing, because it is mere *obiter*. Especially should it not be done in this case, where the parties in actual interest have never been heard in this court."

Whilst all opinions agreed that we had no jurisdiction to mandamus the judges of St. Louis, because

they were acting in a legislative capacity, it is clear
that the two separate concurrences went no further than
to simply rule upon our jurisdiction. The majority
opinion, concurred in by five eminent jurists, including
the writer of the opinion, and LAMM, KENNISH, FERRIS
and BROWN, JJ., went much further, and passed upon the
merits of the case. So far as we know, that is the last
announcement upon the matter, although we, personally,
expressed no opinion upon that matter, and have none
to express now, in the view which we have reached.

III. In addition to State ex rel. Barrett v. Hitch-
cock, 241 Mo. 433, we are cited to State ex rel. Hallibur-
ton v. Roach, 230 Mo. 408. The question in that case is
not the question in this case. No suggestion was
made in that case as to the fact of Section 57
(Initiative and Referendum) modifying legis-
lative power or authority. In that case the petitions were
for redistricting the State through a constitutional
amendment. The real questions involved are tersely
stated by Fox, C. J., on page 426, thus:

Stare
Decisis.

"First: Were the petitions as presented to the re-
spondent, Secretary of State, legally sufficient to author-
ize the submission to the voters of this State of an amend-
ment to or change in the organic law (the Constitution)
of this State? Or, in other words, do the petitions em-
brace in fact a demand for the submission of a constitu-
tional amendment within the contemplation and purview
of the initiative amendment adopted in this State in
November, 1908, as well as the legislation approved June
12, 1909, providing for the carrying out of such initiative
amendment to the Constitution?

"Second: Under the provisions of the initiative
amendment to the Constitution and the legislation en-
acted by the General Assembly of this State, approved
June 12, 1909, can the respondent, the Secretary of State,
if the subject-matter as embraced in the petition does
not fall within the purview of the initiative and referen-
dum amendment to the Constitution, as well as the legis-
290 Mo.—37

lation enacted for the purpose of carrying out the provisions of such constitutional amendment, decline to accept and file the petitions as presented by Messrs. Dickey and Lake? In other words, has the Secretary of State a discretion where the subject-matter of the petitions is foreign to what was contemplated by the initiative and referendum amendment to decline to file such petitions?

"These are the propositions with which this court is confronted."

The question is thus answered by the learned Chief Justice:

"As heretofore stated, the measure proposed is entirely foreign to an amendment to the Constitution which deals with the subject embraced in the petitions presented. The initiative-and-referendum amendment to the Constitution speaks of laws and amendments to the Constitution. Manifestly those terms are used in their plain and ordinary sense, and in our opinion the petitioners have no right to undertake to put in the Constitution, which is regarded as the organic and permanent law of the State, mere legislative acts providing for the exercise of certain powers."

In other words, the majority holding was that the proposed amendment to the Constitution was not in effect organic law, but a legislative act, and should not be submitted under the false cognomen of an amendment. Whilst the Constitution of 1875 fixed senatorial districts, it is evident that they made them for only temporary purposes, and fixed it as a legislative act and duty thereafter. [Sec. 5, Art. IV, Const. 1875.]

It should further be considered that it is a doubtful question as to whether or not State ex rel. Halliburton v. Roach, supra, has any further binding effect in Missouri. See State ex rel. Stokes v. Roach, 190 S. W. l. c. 279, first column, wherein the majority opinion pointed out the vice of the opinion in Halliburton's case. The present writer combatted this overruling of the Halliburton case, with all the vigor he possessed, but the two opinions and their concurrences will have to speak for themselves. It

at least leaves the Halliburton case as questionable authority. But if an authority, what was written therein did not discuss or have in view the question presented in the present case. Courts usually discuss the questions raised by counsel, without reference to questions which might have been raised. Until raised and passed upon they do not rise to the position of *stare decisis,* now urged by the learned Attorney-General. All the cases he cites as *stare decisis* are upon the same plane. So too, on the theory of *stare decisis* upon the question here involved, no authority can be drawn from the case of State ex rel. v. Patterson, 229 Mo. 373. Read the case. The fact is that the question now before the court is a new one not heretofore urged to or considered by this court, and must be so treated. We discuss these cases purely in the view of *stare decisis.* Upon that, nor upon any other principle, can it be said that they shed light upon the question now urged here for the first time.

IV. The vital question which we have in mind, and which we desire to discuss, is whether or not the amendment of 1908 so conflicts with that portion of Section 7 of Article IV of the original Constitution, which confers conditionally legislative power or authority upon the three named executive officers, as to render the former provision nugatory. A few rules of construction are not inappropriate here. "A clause in a constitutional amendment will prevail over a provision of the original instrument inconsistent with the amendment, for an amendment to the Constitution becomes a part of the fundamental law, and its operation and effect cannot be limited or controlled by previous constitutions or laws that may be in conflict with it." [12 C. J. p. 709; Hardage v. Grant, 106 Ark. l. c. 509.] We applied this rule in the Westhues case, 283 Mo. 547, 224 S. W. l. c. 334, and held that the original Constitution had been modified by Secton 57. A fair interpretation of the language used, having in view the fundamental purpose to ascertain and give effect to the intent of the fram-

*Construction.*

ers of the instrument, including the amendments if such there have been, is a rule of construction. The construction should not be technical, nor should it be liberal or strict, but should be a fair interpretation having in full view the intent of the framers of the organic law. [12 C. J. 700.]

Some authors, however, urge a rather liberal construction. [Black on Interpretation of Laws, secs. 7 to 11 inclusive; 1 Story, sec. 412; 6 R. C. L. sec. 44.] They all agree that the intent of the framers is the corner stone for the construction. In this case it matters not just which view of the rule you take. If the amendment of 1908, on any given subject, conflicts with portions of the instrument as it stood before the amendment, those portions must fall in obedience to the later expressions found in the amendment. We found that there was conflict as between the amendment and Section 36 of Article IV, and that such conflict practically wiped out the power of the Legislature over emergency clauses. [State ex rel. v. Sullivan, 283 Mo. 547, 224 S. W. 1. c. 334.] So too Section 1 of Article XV, which reads: "This Constitution may be amended and revised *only* in pursuance of the provisions of this chapter." The amendment authorizes a constitutional amendment by the initiative, and this modifies Section 1, and the whole of Article XV. It wiped out the word "only." No sort of sophistry can hide the two conflicts mentioned, supra. The conflict between the proviso, or last clause of Section 7 of Article IV, and the amendment of 1908, in our judgment is just as clear as we shall try to demonstrate in the succeeding paragraphs, having in mind the divers thoughts and rules of constitutional and statutory construction. If the conflict is apparent rules of construction can lend little or no aid. We shall simply point out the conflict, and declare that the intent of the amendment of 1908 must prevail, because the last expression of the people upon the same subject. The subject is the grant of legislative power, not restrictions upon legislative action. Much is said in the briefs about restric-

*Legislative Action: Restrictions.*

tions upon legislative action, which counsel contend would be wiped out if the contention of relator prevail. The idea is far fetched. The amendment was not dealing with restrictions upon the right, power or authority of the General Assembly. It deals with the course of legislation, rather than the subject-matter of legislation. It so deals with the course of legislation as to make the people the ultimate arbiters, either by referendum or by the initiative. It therefore was intended to cover both acts of commission and omission upon the part of the legislative body. We shall not discuss the shades of difference between "legislative power" and "legislative authority." In Article IV of the original Oregon Constitution they used the terms, "The legislative *authority* of the state shall be vested in a legislative assembly," etc. [Oregon General Laws by Deady in 1864.] When they adopted the initiative and referendum later, they used the same words as used in the original constitution of 1857. We borrowed the amendment of 1908, from Oregon, or some state which copied from Oregon, and hence the use of the word "authority" instead of power. Oregon used it as an equivalent term. The power or the authority of the General Assembly to act, is what power or authority is left, after the reservations and restrictions as declared by the people through the organic law. There is nothing upon the face of this amendment to indicate an intention of the framers to wipe out all restrictions or reservations in our Constitution. They will be found in Articles II, IV, X and XII, and perhaps elsewhere. Those in Article II (our Bill of Rights) are really declarations of things necessary to a republican form of government, and are borrowed largely from the Federal Constitution. They are really reservation of rights in the people, and a withdrawal of such subjects from legislative action. Only in this limited sense can they be called restrictions upon legislative power or authority. They are in fact reservations of rights, over which there was no grant of power to the legislative department. But there are numerous restrictions in the other sections

named, in which the law-making body is met with the injunction, "Thou shall not," and two of such (Sections 14 and 15) are found in Article II. These are restrictions in the true sense of the term. But be this as it may, there is no evident intent to be drawn from the amendment of 1908 which would justify the conclusion that it was the purpose of the people to so tear asunder the previous organic law, as to withdraw any restriction upon legislative authority or power. If this amendment withdrew one restriction, it withdrew all, and it is unthinkable to say that such was the intent of the people. On the contrary they were undertaking to secure the rights of referendum and initiative upon all legislative subjects. Things reserved to the people, and restricted by the people, were not legislative subjects. They were undertaking to so fix the grants of legislative power or authority as to subject all legislative action to the referendum and the initiative. The best way to do this was to place the legislative power, as then recognized, in a single forum, and reserve the right to refer, if this forum acted, or to initiate, if it did not act. The then legislative power was limited by reservations and restrictions, and they were dealing with it as it then existed, and not otherwise. So that reservations and restrictions drop out of the case. [Kadderly v. Portland, 44 Ore. 146; State ex rel. v. Richardson, 48 Ore. l. c. 319.]

This amendment authorizes the people to initiate laws, yet no court would hold that they could initiate a valid law if such law was opposed to any reservation of power, or restriction of legislative power, contained in the Constitution at the adoption of the amendment. See the Oregon cases supra, both of which were before we adopted our amendment. The framers of the amendment had no such intent, and their intent must clearly appear from the document. If they initiated and voted a law lending the State's credit "to any person, association or corporation" we would have to hold such law void, as violative of Section 45 of Article IV. So throughout the restrictions upon legislative power or authority.

State ex rel. Lashly v. Becker.

The sole idea was to centralize legislative authority or power in a given and single forum, so that the referendum and initiative rights of the people would be preserved. They did not intend, nor do thoughtful people think, that they intended to utterly destroy the reservations and restrictions of the document that they were amending. As said their purpose was to center all legislative power or authority (as we have defined it supra) in one single legislative forum, so that they could invoke either the referendum or the initiative. That forum they made the general assembly. This excludes legislative power or authority from other independent branches, or officers, of the government, and the thing before us in a constitutional grant of legislative powers to three executive officers.

V. It is further urged that if relator's contention is good, then the amendment of 1908 wipes out the veto power of the Governor. This is not true. [State v. Kline, 50 Oregon, l. c. 431; Oregon v. Tel. & Tel. Co., 53 Oregon, l. c. 164.] This, it is said, is a legislative act, by an executive officer, and if the idea was to hus-

Governor's Veto. band in the General Assembly all legislative authority or power then this power was swept away from the Governor. The cases are not uniform upon the question as to whether the signing of bills, and the vetoing of bills, is legislative or executive—whether it is a grant of legislative power, or a restriction placed upon legislative power and authority. In some states, where the grant of this power is in that portion of the constitution relating to the executive department, it is ruled that these acts are not legislative but executive, and therefore but another restriction upon legislative action. [State v. Mounts, 36 W. Va. 179.] In our State the power is granted by Sections 12 and 13 of Article V, which refers solely to the executive functions of the government. In many states where this power of the Governor is vested in him by that portion of the state constitution which pertains to the legislative power or

authority, these acts of the Governor are held to be legislative. We do not deem this distinction very material in this case, if we are right in holding that the purpose of the amendment was to confine legislative action to a single forum, so that the people should have the full power of initiative and referendum. That single forum would include all officers whose acts were required either to complete a law or defeat a law. In other words, it would include the Governor, if he be a part of the legislative power, and if not, it is yet preserved by the very amendment itself. In fact, it is preserved, whether the acts be either legislative or executive, in the matter of enacting or defeating laws. Bearing in mind that the pole star of construction is the intent of the framers of a constitution, or of an amendment thereto, let us turn to the amendment itself. In it we find the sentence, ''The veto power of the Governor shall not extend to measures referred to the people.'' This shows the clear intent of the framers. This is a withdrawal of the veto power from the Governor as to all bills referred and voted upon by the people. It, in every reasonable sense, refers not only to measures under the referendum, but to initiated laws. As to them the veto could not be exercised. To illustrate, a law might pass through the usual channel of the General Assembly, and be vetoed. It might then be passed over the veto, and later referred to the people. In such case the veto power was taken away, provided the people voted to sustain the law. If a law was initiated by the people and voted by the people, then the law is enacted. There is no veto power there. [See Oregon cases, supra.] So that it is clear, that by this amendment the framers thereof did not intend or undertake to absolutely destroy the veto power. The fair readings of it, considering the exception incorporated therein, as we have quoted, supra, shows that as to all matters referred to the Governor by the General Assembly his veto power was left intact. If the intent was to destroy the veto power, why the exception quoted, supra? There would be no need for it, and the fact

State ex rel. Lashly v. Becker.

that it was placed in the amendment is proof positive that the intent was to preserve the veto power, whether it be legislative or executive in character. There could be no stronger evidence of this intent than this clause excepting certain measures from the veto. Such act meant that as to all others the veto was left in force. Whilst this thought is in mind, may we say that this but emphasizes the fact that the intent of this amendment was to so center the law-making power in one forum (including the General Assembly and the Governor) so that all acts from that forum should be subject to either the referendum or the initiative. But of this later. Suffice it to say that the amendment itself destroys respondent's contention as to the veto power of the Governor.

VI. We now reach the question of conflict between the proviso, or last clause of Section 7 of Article IV, and the amendment of 1908. Amendments to constitutions are usually made to either add to or correct previous provisions of the organic law. In either

Senatorial Districts: Legislative Power.

case conflicts might arise. If they do arise, the real intent of the framers of the amendment prevails over the provisions of the original. This rule is so universal, as indicated by the authorities, supra, that we need not add here. We have, supra, pointed out two distinct conflicts, and indicated a third. The purpose now is to point out in plain terms the conflict between the proviso to Section 7 of Article IV, and the amendment of 1908. We shall not mince words, having in previous paragraphs eliminated all underbrush so as to preclude camouflaging of thought or views upon the vital question of conflict.

By the amendment of 1908 (which prevails if it conflicts with previous parts of the original organic law) it is said: "The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives." Then follows the reserved rights of the people to refer legislative acts, and to initiate laws. The legislative acts so referred to, include

the approval and veto power of the Governor, as we have indicated above, and as the authorities held. Legislative power or authority as here used must be construed as meaning such as was not reserved or restricted, as we have just discussed. That the framers so meant is clear from what they did, and from the very purpose of the referendum and initiative. Their purpose, and their intent was to gather together and lodge in one legislative forum all legislative power or authority. If this was the intent and purpose of the amendment, then it gathered to the legislative forum the conditional grant of legislative power to those three executive officers. ''The legislative authority of the state'' includes all legislative authority, existing at the time. If all legislative authority was vested in a given legislative forum (including the General Assembly and the Governor) the legislative authority of these three executive officers was gathered unto the fathers, and must be for naught held. ''The legislative authority'' needs no defining. It is in substance *all* legislative authority. All legislative authority must be construed in the light of the reservations and restrictions upon legislative action. As to reservations and restrictions the intent of the framers was to preserve them, but it is as clear that their intent was to so concentrate legislation or legislative acts, as to give them power to supervise them either by the referendum or the initiative. This was the very reason for the amendment. All concede, and if not, the cases and the Constitution so hold, that the redistricting of the State is a legislative act. If the framers of the amendment had not thought that they had gathered into one bunch all legislative authority or power, and placed it in one channel, so that they could review the same, if dissatisfied, they might have extended both the referendum and initiative. They thought, and they intended to place ''the legislative authority'' in such position as to enable them to review by referendum all acts of a legislative character. If this be the intent of the amendment, then it conflicts with the proviso, or last clause, of Section 7 of Article IV.

To say that this was not the intent of the framers of the amendment and of the people in adopting it would be to say that they had more confidence in these three executive officers than they had in the General Assembly, or even in themselves. This too, in the face of the historical fact that for thirty years or more there was continous complaints from the people and the press about the manner in which these executive officers performed this legislative function. By use of ''the legislative authority'' the people meant to so place the legislative function of redistricting the State in a position where they could review it by referendum. But this is not all. They reserve the right to initiate laws, and after the Legislature refused to act (or even before) the people had the right to initiate a law (not a constitutional amendment) redistricting the State. Their power to initiate laws is unrestricted, provided such laws violate no reserved rights or legislative restrictions. As legislators, the people are under the same restrictions as the General Assembly. Whether such initiated laws violate the Constitution is a matter for the courts after the legislative process is over, and the law (the finished products) is presented to the courts. One illustration to demonstrate a conflict in the matter before us. Suppose that after the General Assembly of 1921 had failed to redistrict the State the people by proper petitions had initiated such a law. Suppose further that the initiated law received the required vote, and was thereby adopted. Suppose further that in the interim these three executive officers had made a law redistricting the State. Which would stand? There can be no question that the initiated law would have to be sustained. If so then the very fact that the people have the unrestricted right to initiate laws (within constitutional restrictions) demonstrates that these officers were shorn of legislative authority by this amendment. We have read the Missouri Constitution until in our mental vision (both by day and by night) we can see it as we see the pictures upon the sitting room wall. The best thought we have has been

given to the question involved. The question is a new one in this State, and elsewhere, so far as our diligent research has gone. In no preceding Missouri case has this question been presented or argued by counsel. Isolated language in previous cases is of no value, where the question was not urged. At most such language is *obiter*, and not *stare decisis*. We conclude by saying, that, in our judgment there is a fatal conflict between the amendment of 1908, and the proviso or last clause of Section 7 of Article IV. That by reason of such conflict the latter must fall, and the state officers were without power to redistrict.

VII.     Before discussing the question of the redistricting done in 1901 may we be permitted to add one more thought to the matters discussed in the last previous paragraphs? Under the amendment of 1908 all legislation must be (1) through the ordinary channel (the General Assembly and Governor), (2) through the acts of the people by the referendum, or (3) through the reserved right to initiate any and all laws that the people desire enacted. In the latter case, as well as in the first, such laws must be within the reservations and restrictions contained in the Constitution. [State ex rel. v. Richardson, 48 Ore. l. c. 319.] This case construed the Oregon initiative-and-referendum amendment, and this construction was in April, 1906. We borrowed the amendment in 1908, or two years after the Supreme Court of Oregon had announced the opinion in Richardson's case. The whole fallacy of respondent's position is that they argue as if the constitutional grant of this legislative power to these three officers was a restriction upon, rather than a grant of, legislative authority. As a grant of legislative power, it was gathered up and placed solely in the General Assembly and the people by the amendment of 1908. You cannot say "the legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives," and reserve to the people both the

Acts of 1901.

right to refer and initiate, and yet say that any portion of legislative authority belongs elsewhere. The very language precludes such a conclusion.

In the return it is urged that the redistricting of the State in 1901 was violative of constitutional provisions and void. This and previous redistricting acts have been subjected to the charge of partisanship and unfairness, and even as violative of the Constitution, and we have but little doubt that this in a measure influenced the wording of the amendment of 1908, by which the people by reserved rights were placed in position to take the matter in their own hands. But even if it be granted (which we do not do) that the redistricting of 1901 was invalid, it does not help respondent. Should we take up and rule the question in respondent's favor, it would only relegate us to the redistricting of 1891, and by it the 25th Senatorial District is composed of the identical counties as by the Act of 1901. This Act of 1891 stands unchallenged in the pleadings. So, if we concede the invalidity of the Act of 1901, relator would be in the 25th District, composed of the counties which now present his name as their choice as a candidate for delegate to the coming Constitutional Convention. The facts that he lives in a district which has existed in the same form from the 1891 redistricting act, which act is not questioned here, entitles relator to his writ of mandamus, whatever be the status of the Act of 1901 as to senatorial districts.

*Laches.*

The petition attacks the act of the three officers in 1921, and none other. It is no defense to this attack to say some other previous acts by other officers were also void. [Adams v. Bosworth, 126 Ky. l. c. 63 and 64; Ragland v. Anderson, 125 Ky. l. c. 161.] With this we might stop. However, the situation is such (there being but short time left to select delegates to the coming Constitutional Convention) we feel that something further should be said as to the redistricting of 1901. This redistricting act has stood unchallenged for more than twenty years. The first court attack appears in the return in

this case. Of course there were mutterings among the people (or some of them) and in the public press, known as state history. In State ex rel. Warson v. Howell, 92 Wash. l. c. 545, the Supreme Court of Washington in discussing their redistricting Act of 1901, said:

"But even if it were concluded that the Act of 1901 was such a departure from the requirements of the Constitution as to disclose a wilful disregard of its provisions, we think it now too late for the relator to raise the question. The act complained of has stood unquestioned for more than fifteen years. Seven legislatures have been elected under it. Laws have been passed which so far affect the rights of the electors that a return to the old districts marked out by the Constitution would result in the utmost confusion, if not chaos, requiring perhaps a session of the Legislature before an election could be held. No court is required, on a complaint made after this lapse of years, to subject the people of the State to the turmoil such a course would cause. This form of legislation is to a great extent political and administrative in its nature, and involves no individual rights other than such as pertain to the electorate as a whole. Persons who conceive that the Legislature has acted in disregard of the mandates of the Constitution must, therefore, act promptly else they will be held to have waived their right to act at all.

"The argument that, if an act is invalid when passed, the vice continued to live in it as long as it remains on the statutes, and therefore may be annulled at any time, is not sound when attempted to be applied to legislation that is political or administrative in its nature. It may be true the laches cannot give validity to a void act, but when no property right is involved, and the question is purely political and administrative, individuals or parties that have seen the act in operation for years, and the affairs of State carried on under it, without offering objection or making protest, will not be heard at a late day to question its validity. They must act in seasonable time and not delay until the conditions

they have acquiesced in and assented to have become firmly established as a part of the system of government."

In Adams v. Bosworth, 126 Ky. l. c. 65, the court said:

"If the enactment complained of was invalid because it violated the constitutional requirements, the party complaining knew this fact thirteen years before this suit was commenced. Persons who believe that their political rights are injuriously affected by unconstitutional legislation cannot condone the wrong for a long period of years by passively consenting to it, and defer taking action until confusion, if not chaos, would result from the long delay. The courts were open to them in 1893 as well as 1906, and political parties, no more than individuals, can sleep on their rights. When it is sought to vacate enactments involving the life of one of the great co-ordinate departments of the government the public interest and the orderly administration of affairs demand that action should be taken as soon as practicable after the condition objected to becomes known and effective. The argument that, if an act is invalid when passed, the vice continues to live in it as long as it remains on the statutes, and therefore it may be annulled at any time, is not sound when attempted to be applied to the legislation that is political or administrative in its nature. It may be true that laches cannot give validity to a void act; but when no property right is involved, and the question is purely political and administrative, individuals or parties that have seen the act in operation for years, and the affairs of State carried on under it, without offering objection or making protest, will not be heard at a late day to question its validity."

In the case of Matter of Reynolds, 202 N. Y. l. c. 438 it is said:

"After the census of 1905 the Legislature at its session in 1906 passed an apportionment act. [Ch. 431.] The validity of that act was attacked by an application for a mandamus to the Secretary of State to issue the election notices in accordance with the old apportion-

ment on the ground that the new apportionment was a nullity. This application was denied by the Supreme Court in both branches and the elections of 1906 were held under the apportionment act of that year. On appeal to this court, however, the orders of the Supreme Court were, in April, 1907, reversed and the apportionment under review declared invalid. [Matter of Sherrill v. O'Brien, 188 N. Y. 185.] Thereupon, at an extraordinary session of the Legislature held in that year, the present apportionment was enacted. Under it have been held the general elections of 1907, 1908, 1909 and 1910, during which period the petitioners have taken no steps to have the validity of that apportionment reviewed. There are few things in the world in which stability and order are more requisite than in government. It could not have been the constitutional intent that at any time during the decennial period for which an apportionment is to continue—even up to the last moment—it should be subject to attack.''

To like effect is Ragland v. Alexander, 125 Ky. l. c. 161. These authorities seem to be founded upon reason, and if so it is too late to question the Act of 1901, at this time, and we so rule. From it all, we conclude that the alternative writ of mandamus in this case should be made permanent. It is so ordered. *James T. Blair, C. J.,* *Woodson* and *Walker, JJ.,* concur; *Higbee,* and *D. E.* *Blair, JJ.,* dissent in separate opinions to be filed; *Elder,* *J.,* files separate opinion.

·ELDER, J. (separate opinion).—In view of the importance of this case, I have thought it not unbecoming to state my individual views thereon, although somewhat hurriedly expressed. No other opinion being before me at the time of the preparation hereof, nothing said herein is intended as a comment upon or answer to anything contained in any opinion which may be filed by any of my associates.

I. The primary issue in this proceeding involves the construction to be placed upon two of the provisions

of our Constitution. Learned counsel for relator, in their original brief, contend that so much of Section 7 of Article IV of the Constitution as vests power to district the State for Senators in the Governor, the Secretary of State and the Attorney-General is repealed by Section 57 of said Article IV, and that the redistricting made by the said officials under date of April 16, 1921, is void. Section 7 of Article IV is as follows:

Construction.

"Senators and Representatives shall be chosen according to the rule of apportionment established in this Constitution, until the next decennial census by the United States shall have been taken, and the result thereof as to this State ascertained, when the apportionment shall be revised and adjusted on the basis of that census, and every ten years thereafter upon the basis of the United States census; or, if such census be not taken, or is delayed, then on the basis of a State census; such apportionment to be made at the first session of the General Assembly after each such census: *Provided,* That if at any time, or from any cause, the General Assembly shall fail or refuse to district the State for Senators, as required in this Section, it shall be the duty of the Governor, Secretary of State and Attorney-General, within thirty days after the adjournment of the General Assembly on which such duty devolved, to perform said duty, and to file in the office of the Secretary of State a full statement of the districts formed by them, including the names of the counties embraced in each district, and the numbers thereof; said statement to be signed by them, and attested by the Great Seal of the State, and upon the proclamation of the Governor, the same shall be as binding and effectual as if done by the General Assembly."

That portion of Section 57 which is pertinent hereto is as follows:

"The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to

290 Mo.—38

themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly.''

In support of their contention counsel argue substantially thus: That by the Constitution adopted in 1875 the people ''made full disposition of all the legislative power of the State, reserving none whatever to themselves, except, of course, the power to amend the Constitution or to write a new one;'' that in the Constitution as originally adopted it was provided by Section 1 of Article IV that, ''The legislative power, *subject to the limitations herein contained*, shall be vested in a Senate and House of Representatives, to be styled 'The General Assembly of the State of Missouri' '' (Italics ours); that one of the limitations mentioned in Section 1 was embodied in Section 7, being that portion hereinbefore set out, giving the Governor, Secretary of State and Attorney-General, in a certain contingency, the power to district the State for Senators; that in 1908 the people ''had become dissatisfied with this arrangement and desired to change it,'' and adopted an amendment to the Constitution, being Section 57 of Article IV, partly hereinbefore set forth; that by Section 57 *all* of the legislative power of the State was disposed of and vested in a Senate and House of Representatives, with but one reservation, to-wit, the power of the people themselves ''to propose laws and amendments and to. enact or reject the same at the polls, independent of the legislative assembly;'' that such disposition of *all* of the legislative power left no part of it elsewhere; and that accordingly the former limitation in favor of the Governor, Secretary of State and Attorney General, being in irreconcilable conflict with Section 57, was in effect thereby stricken out and the Governor and his associates ''shorn of all legislative authority theretofore vested in them.''

To have followed this reasoning to its logical conclusion, the inevitable result reached would have been

that Section 57 also struck out of the Constitution all of
the limitations on the authority of the Legislature, such
as the prohibitions against enacting any law impairing
the freedom of speech or the obligation of contracts,
against permitting money to be drawn from the treasury
except in pursuance of regular appropriations made by
law, against giving or loaning the credit of the State,
against contracting debts except in certain instances,
against granting public money, against subscribing for
stock on behalf of the State, against the enactment of the
thirty-three special and local laws inhibited by Section
53 of Article IV, and against the exercise of the taxing
power contrary to the restrictions prescribed by Article
X, together with the many other restraints imposed by
the Constitution, all comprehended by the words "the
limitations herein contained," appearing in Section 1.

The utter fallacy of this startling reasoning must
have become apparent to counsel for relator for, upon
oral argument, they abandoned the theory thus initially
advanced, and bottomed relator's case upon an attenu-
ated hair line distinction between the meaning of legis-
lative "*power*," as used in Section 1 of Article IV, and
legislative "*authority*" as used in Section 57 of Article
IV.   (Italics ours.)   In their reply brief they endeavor to
differentiate between *power* and *authority* (which in our
judgment are used in the Constitution as equivalent
terms), substantially thus: That *all* legislative *power* is
originally in the *people;* that by the Constitution only so
much *power* was bestowed upon the *State* as the people
saw fit to bestow; that the power not bestowed either re-
mains in the people or is held in abeyance; that the legis-
lative power bestowed upon the State is the "measure
and extent" of the legislative *authority* of the *State;*
that when by Section 1 of Article IV the "legislative
power, subject to the limitations herein contained," was
vested in a Senate and House of Representatives, *all* of
the *power* of the *people* was so vested; that under Sec-
tion 7 of Article IV, embracing one of the limitations
contemplated by Section 1, the Governor and his as-

sociates, as a part of the *State,* thus become empowered to act in the contingency named; that when Section 57 of Article IV was adopted, said section made a re-assignment of the legislative *authority* of the State, which had theretofore been vested in the Senate and House of Representatives, *exclusively,* except such as was reserved to the people themselves; and that, accordingly, the Governor and his associates have *neither power nor authority* to redistrict the State for Senators. If this conclusion be true, then, when the people by Section 57 resumed all of the legislative *authority* originally given to the General Assembly and the Governor and his associates and re-vested the same in the General Assembly alone, Section 57 superseded *not only the limitation embraced in Section 7 but all of the limitations contemplated by Section 1 as well,* being the numerous limitations adverted to by us supra. Palpably, therefore, relator is driven back to his abandoned theory, which is so revolutionary and so contrary to the principles of constitutional construction as to require but slight reflection to compel us to decide adversely thereto.

The real sum and substance of what relator urges is that so much of Section 7 as is relevant hereto was repealed by Section 57 *by implication,* and this in the face of the cardinal rules of both constitutional and statutory construction, that repeal by implication is not favored, that to establish a repeal the two provisions in question must be plainly and irreconcilably repugnant to each other, and that if, by any reasonable construction, both provisions can be construed together, both will be sustained.

However, our disposition of relator's insistance does not depend upon an analysis of the princi ˌ ʒs of construction, for this court has heretofore in effect ruled

**Stare Decisis.**
upon the point now made, in a case involving facts sufficiently analogous to those at bar to be controlling. In State ex rel. Halliburton v. Roach, 230 Mo. 408, a proceeding to have this court issue its peremptory writ of mandamus against the Secretary

of State to compel him to file certain petitions presented to him by citizens acting under a right assumed to have been conferred by the initiative and referendum amendment (being Section 57 of Article IV), which petitions submitted an amendment to the Constitution redistricting the State senatorially, it was held that Section 7, notwithstanding the adoption of Section 57, continued to control the matter of altering the senatorial districts of the State, Fox, J., in an opinion fully concurred in by our learned brother GRAVES, said, l. c. 431: "Manifestly before the senatorial districts can be divided in the manner as suggested in the so-called proposed constitutional amendment, Section 7 of Article 4 of the Constitution of this State must be amended and so changed as to authorize, by the initiative, the people at the polls to divide the senatorial districts. . . . In other words, the exercise of the power by the initiative to alter and divide the senatorial districts by a legislative enactment cannot have the force and effect of dislodging the power vested by the Constitution under Section 7 of Article 4, providing for the apportionment of senatorial districts. Before the power to alter and divide the senatorial districts can be exercised there must be an appropriate amendment to the Constitution dislodging the power to so divide and alter such districts under the present Constitution and laws of this State." This ruling was tantamount to holding that Section 57 (the Initiative-and-Referendum Amendment) *did not repeal Section 7,* but that said section *remained the sole repository of authority for redistricting the State.*

That Section 7 of Article IV is still extant and governing in the matter of a senatorial re-apportionment was further recognized by this court on June 21, 1910, later than the adoption of Section 57, in State ex rel. Major v. Patterson, 229 Mo. 373, a *certiorari* proceeding to quash an order made by the County Court of Jackson County subdividing said county into new legislative districts, wherein it was said by GRAVES, J., l. c. 388; "Of course, as to the senatorial districts, if the Legislature

fails to apportion, the apportionment may be made by other officers mentioned in Section 7 of Article 4 of the Constitution, which action upon their part stands in lieu of legislative action.'' And further, at page 389: ''It is clear that as to all senatorial districts save and except those within a single county, the power to fix the lines thereof lies with the Legislature, or in the event of its failure to act, with the Governor, Secretary of State and Attorney-General.''

Again, that Section 7 is still controlling in the matter of re-apportioning the State for Senators, was conceded on March 28, 1912, also later than the adoption of Section 57, in State ex rel. Barrett v. Hitchcock, 241 Mo. 433, wherein said section was construed and applied.

These three pronouncements are decisive of the question here presented. It follows, therefore, that unless we are now desirous of departing from the precedent thus established, the contention of relator must be ruled against him.

II.   Relator also insists that the ''attempt'' made by the Governor, Secretary of State and Attorney-General ''at redistricting is so unfair as to convenience, equality of population and compactness of territory, as to make it void.'' The matter of convenience is not stressed by relator and we shall not dwell thereon.

Convenience:
Compactness:
Population.

The constitutional requirements with respect to senatorial districts are that they shall be ''convenient;'' that they shall be ''as nearly equal in population as may be,'' and that when composed of two or more counties, ''they shall be contiguous, such districts to be as compact as may be, and in the formation of the same no county shall be divided.'' [Secs. 5 and 9, Art. IV.] Under the Constitution the duty imposed upon the Governor and his associates is not that they shall so district the State as to have every district *exactly equal* in population and *perfectly compact* in territory. Exact mathematical precision is not a requirement, and, when it is considered

that county lines must be adhered to, unless a county is equitably entitled to more than one senator, and that indivisible counties vary in size, shape and population, it is obvious that such precision cannot be attained. The real duty enjoined upon the officials acting is that they shall lay out the districts so that they are *"as nearly equal"* in population *"as may be,"* and *"as compact"* in territory *"as may be."* Such is the language of the Constitution. And it is by that yardstick that the action taken must be measured. The expression "as nearly as may be" does not mean as nearly as a mathematical process can be followed. It is but a direction addressed to the body charged with the duty prescribed, expressive of the general principles upon which the apportionment shall in good faith be made.

Applying this standard to the districts before us, we are convinced by an examination thereof, that the same, when considered as a whole, as is essential, fairly comply with the constitutional requirements. Having in mind the several separate commands of the Constitution, no argument is required to show that absolute numerical equality in districts cannot be obtained. If county lines cannot be broken, disparity in population is unavoidable. It is also evident that if the requirement as to compactness is to be given effect, there must be a latitude of action in regard to population. Therefore, when but four districts out of thirty-four are attacked as being non-compact, with room for question as to the merit of such attack, and when the average variation in population from the true ratio of equality, as shown by respondent's brief, is but five and four-tenths per cent, we are not prepared to hold that the judgment and discretion of the Governor and his associates was not exercised in a reasonable, practicable manner, and within the contemplation of the Constitution. And, when compared with the districts created in 1901, the validity of which is attacked by respondent in his return filed herein, it is patent that the 1921 districts are infinitely superior, in every respect, in conforming to the constitutional mandate.

From what has been said, it follows that relator's insistence as to the invalidity of the 1921 redistricting should be ruled against him.

Entertaining the views herein indicated, I respectfully submit that the writ of mandamus should be denied.

DAVID E. BLAIR, J. (dissenting).—I am unable to concur in the majority opinion and will state my reasons as briefly as I can.

The vital question in the case is the effect on Section 7, Article IV, of our Constitution of the adoption of Section 57, Article IV, known as the initiative-and-referendum amendment. Relator in brief and

Effect of
Amendment
of 1908.

argument vigorously attacked the senatorial redistricting act of 1921, performed by the Governor, Attorney-General and Secretary of State, on the ground that it is not a fair apportionment and violated the mandates of the Constitution as to compactness, convenience and equality of population. But when compared with the redistricting for senators done in 1881, 1891, 1901 and the attempted apportionment of 1911, and even with the model fixed by the Constitution of 1875 itself, the redistricting of 1921 is shown to excel them all on every basis of comparison, and only those blinded by partisanship or self interest will seriously contend that the 1921 redistricting does not come as nearly to complying with the requirements of the Constitution as it is possible to do.

In holding that Section 7, Article IV, of the Constitution has been repealed in so far as it provides for the performance of the duty of redistricting the State by the

Construction.

designated state officials, the majority opinion violates the universally recognized rules of statutory and constitutional construction that all parts of a law or constitution, including amendments, must be read together; that when two constructions of a particular provision are possible, and one is in harmony with and the other repugnant to another provision dealing with the same subject, that construction which is

in harmony with the other provision must be adopted; that the presumption is against repeal by implication and such repeal is not favored. If Section 7, Article IV, has been repealed by the adoption of Section 57, Article IV, in 1908, it is by implication and the presumption is against such repeal.

Every student of recent history and of the progress of the science of government knows that the reason for the adoption of the initiative-and-referendum amendments to the constitutions of the several states was the distrust of and the dissatisfaction with the legislature in the character of its enactments in respect to the ordinary subjects of legislation, and in the lack of responsiveness of such bodies to the popular demand for the enactment of desired legislation. It cannot be seriously contended that the failure of our General Assembly to exercise its power to redistrict the State, thereby leaving the duty to be performed by the named state officials, played the slightest part in the demand for the initiative. The expressed purpose of the amendment was to provide for the initiative and referendum. Nothing was said in the title of the resolution submitting such amendment about "relocating" the legislative power. [Laws 1907, p. 452.]

*Purpose of Amendment.*

Observing the great rules of construction referred to, no difficulty appears in leaving Section 7, Article IV, intact and construing Section 57, Article IV, as merely a declaration by the people that they reserve to themselves the power by use of the referendum to pass upon the laws enacted by the General Assembly within its ordinary powers as fixed by the Constitution at the time of the adoption of the amendment, and by means of the initiative to propose and pass laws such as the General Assembly might itself pass. The initiative amendment not having in express terms referred to Section 7, Article IV, it is our duty to construe the whole Constitution, including the amendment, in such a way as to preserve Section 7, Article IV, intact, if it can be done. In other words, by the adoption of Section

*Construction.*

57, Article IV, the people simply reserved to themselves the power to do the acts and things which were by the Constitution delegated to the General Assembly. Acts which the General Assembly could not do because of constitutional limitations, restrictions or exceptions, or because of constitutional grants of such power to other agencies, the people themselves did not reserve to themselves to do.

This is the only construction that will give a reasonable meaning to Section 57, Article IV, without doing violence to other parts of the Constitution, including Section 7, Article IV, and to existing laws of the State, which the slightest reflection and the exercise of common sense will show were surely not intended by the framers of the amendment to be affected by it. So construed there is no conflict between Section 57, Article IV, and Section 7, Article IV. To accept relator's contention is to strike down all limitations, restrictions and exceptions, and to treat as withdrawn all constitutional grants of legislative authority to agencies other than the Legislature, and all prior delegation of legislative power made by the General Assembly itself.

The majority opinion reached the conclusion that the initiative-and-referendum amendment did not affect the restrictions upon legislative power imposed by the Constitution and that it is unthinkable to hold that such was its effect. In the name of reason, why not? To admit a single exception either of reservation or of grant is to destroy the very foundation upon which the majority opinion rests. The people are the source of all power, legislative, executive, judicial. They had previously vested the legislative power of the State in the General Assembly, subject to certain restrictions and limitations. If Section 57, Article IV, restored *all* legislative power to the people themselves, were not *all* restrictions merged in the people when such power was so restored, and, in again bestowing legislative power upon the Legislature, did they not bestow it limited and restricted *only* by the right of the people

Restrictions.

to refer legislative enactments and to initiate and pass laws? I agree that it is unthinkable that such was the intent of the people in adopting Section 57, Article IV. But how can such conclusion be avoided, if such amend-. ment be construed as a resumption by the people of *all* legislative power? How can the majority opinion stand without assuming such complete resumption? A reasonable construction of the amendment is that all the people sought and accomplished by such amendment was a reservation of power to require approval by the people themselves of all acts passed by the General Assembly, except as stated in the amendment, and the power to initiate and pass laws that the General Assembly itself previous to that time might have passed, and to amend the Constitution by direct action. The powers and duties of the Legislature as fixed by the Constitution, with this exception, were not disturbed. Restrictions and limitations on legislative power and grants of legislative power provided elsewhere in the Constitution were not affected.

The General Assembly having failed to divide the State into senatorial districts at its first session after the population of the State had been ascertained from the 1920 census, the only time it is authorized by the Constitution to do so, and that act having been performed under the provisions of Section 7, Article IV, by the designated state officials within thirty days after the adjournment of the session of the General Assembly upon which the duty devolved, the General Assembly was thereafter deprived of constitutional power to redistrict the State, and the people only having reserved to themselves such power as a subsequent General Assembly might possess in the premises, were without power to redistrict the State by the initiative.

Such was the view of this court in the case of State ex rel. v. Halliburton, 230 Mo. 408, decided many months after Section 57, Article IV, was adopted. It was sought

The Halliburton Case.

by the required number of petitioning legal voters, acting under the initiative amendment of the Constitution, to sub-

mit by initiative to the voters a purported amendment
to the Constitution redistricting the State for Senators.
Mandamus was invoked to compel the then Secretary of
State to file the initiative petitions which he had refused
to file.    The court held that while said petitions de-
nominated the proposal a constitutional amendment, it
was in effect legislative in character and that it sought
to amend a section of the Constitution legislative in
character and by its terms limited in duration and ap-
plication and a dead enactment by reason of the consti-
tutional redistricting of the State into districts in 1881;
that such legislation contravened Section 7, Article IV,
of the Constitution which gave the power to redistrict
the State to the General Assembly at its first session
after the population of the State had been determined
by the decennial census of the United States, or on fail-
ure of the General Assembly to act, to the designated
state officials.    I quote from the majority opinion written
by Chief Justice Fox, a portion not quoted or referred
to in the majority opinion, beginning at page 431, as
follows:

"Manifestly before the senatorial districts can be
divided in the manner as suggested in the so-called pro-
posed constitutional amendment, Section 7 of Article 4
of the Constitution of this State must be amended and
so changed as to authorize, by the initiative, the people
at the polls to divide the senatorial districts.    Section
7 of Article 4 of the Constitution, in addition to pro-
viding how the senatorial districts shall be divided, ex-
pressly provides that the apportionment shall be re-
vised and adjusted every ten years upon the basis of the
United States census, or if such census be not taken, or
is delayed, then on the basis of a State census; such ap-
portionment to be made at the first session of the General
Assembly after each such census.    Clearly it will not be
seriously contended that the senatorial districts might
be altered and changed in the manner suggested by the
so-called amendment to the Constitution without first
submitting to the people of the State an amendment to

Section 7 of Article 4 of the. Constitution, which expressly provides how the senatorial districts shall be divided. If this can be done we again have the anomalous proposition that upon the day of the election we have a Constitution (Section 7, Article 4) in full force, providing how the senatorial and representative districts shall be divided, and without a single change in the constitutional provision, or a single suggestion as to a different method of dividing the senatorial and representative districts, and without any vote by the people under the initiative making any change in the constitutional provision, or any canvass or return of such vote, an absolute exercise of the right to divide the State into senatorial districts. *Manifestly, as heretofore stated, the right to alter and change the senatorial districts as suggested in this so-called proposed constitutional amend-- ment could not possibly attach until it was ascertained that Section 7 of Article 4 of the Constitution of this State had been amended and that such amendment was ratified or adopted upon a proper canvass and return of the votes. In other words, the exercise of the power by the initiative to alter and divide the senatorial districts by a legislative enactment cannot have the force and effect of dislodging the power vested by the Constitution under Section 7 of Article 4, providing for the apportionment of senatorial districts. Before the power to alter and divide the senatorial districts can be exercised there must be an appropriate amendment to the Constitution dislodging the power to so divide and alter such districts under the present Constitution and laws of this State.*"     (Italics ours.)

GRAVES, J., at page 444, concurred in the opinion written by Chief Justice Fox in the Halliburton case, and said, "I fully concur in all that Fox, C. J., has written in this case. The points made by him are unanswerable, but in the argument and in the briefs another point was raised upon which I have well defined views." And he then proceeds to discuss the case from another angle, which furnished an additional reason for con-

curring in the disposition of the case made by Chief Justice Fox.

It would appear that the question of the right of the people to legislate by the initiative on the question of redistricting the State for senators had been adversely decided in a clear-cut manner in the Halliburton case. That is the only conclusion that can be drawn from that case, notwithstanding the fact that the initiative petitions presented what was called a constitutional amendment. This court clearly ruled that the amendment was legislative in character, and because of such legislative character was not a proper subject of legislation, because violative of Section 7, Article IV, of the Constitution. In a proceeding questioning the right of the people to redistrict by the initiative, the case would be squarely in point.

To show further that the effect of the adoption of Section 57, Article IV, on the power of the designated state officials to redistrict the State for senators was before this court in the Halliburton case, and that such issue was squarely decided by this court in that case, I quote from the brief of the Attorney-General in the Halliburton case, which was signed by our present learned Chief Justice, then assistant Attorney-General, and counsel in the Halliburton case, and now concurring in the majority opinion, which quotation is taken from 230 Mo. l. c. 417, and is as follows:

"The power to redistrict the State into senatorial districts is, by Section 7, Article 4 of the Constitution, specifically and exclusively delegated to the Legislature, and, in event of its failure to act, to certain officials therein named. It is in its very nature, as well as by the express terms of the Constitution, a legislative power; yet it was, and is, a power which, being still specifically delegated, cannot be exercised by any authority other than that named, and this condition was, and is, not changed, modified or affected by the adoption of the initiative-and-referendum amendment."

The late John Kennish and the late John C. Brown, both of whom afterwards served the State with great honor and distinction as members of this court, were of counsel for relator in the Halliburton case. It apparently never occurred to those eminent jurists that the adoption of Section 57, Article IV, had withdrawn from the designated state officials the power to redistrict the State, and they joined in defending before this court the right of the people to amend Section 11, Article IV, of the Constitution, the section defining temporary senatorial districts. The reasons which prompted the preparation and filing of petitions looking to such amendment need not be discussed here, but the fact that these eminent jurists evidently thought that the people could only obtain a fair division of the State into senatorial districts by a *constitutional amendment,* at a time when Section 57, Article IV, had been adopted, proclaimed and was in force, is worthy of consideration on the question before us.

The issue was squarely raised and the case was decided on such issue and the decision is controlling. It cannot be successfully distinguished from the case at bar. It should not be overruled without it clearly appears to be fundamentally unsound. It is in effect overruled by the majority opinion, although the majority opinion is entirely silent as to the expressions in the Halliburton case which are out of harmony with the conclusions reached in the majority opinion.

The decision in the present case will unfortunately bear the suspicion of being written in response to the demands of political necessity and as judicial first-aid in the unfortunate political dilemma in which relator and his party associates now find themselves; because of the disastrous election results in 1920. For this reason, unless the unsoundness of the Halliburton case can now be shown with a clearness and certainty approaching a mathematical demonstration, it should be followed. The majority opinion practically ignores it. Considerations of political necessity should not bear a feather's weight

in the scales. Our decisions should be based on reasoning so conclusive, so inescapable as to avoid the suspicion that such considerations were so weighed.

In State ex rel. Barrett v. Hitchcock, 241 Mo. 433, the question of the effect of the initiative was not directly considered. That proceeding was in mandamus to compel the circuit judges of the city of St. Louis to lay out senatorial districts in that city in conformity with the attempted redistricting of the State in 1911 by the Secretary of State and Attorney-General, over the protest and without the proclamation of the Governor. The majority of this court held that the alleged redistricting act was invalid without the proclamation of the Governor, and because the actual division itself did not comply with the mandates of the Constitution, and because the duties of the circuit judges were legislative in character, and therefore this court could not compel them to act in the premises. It apparently never occurred to learned counsel for respondents or the court to urge as a reason why the circuit judges should not be compelled to act, that Section 57, Article IV, had taken away the power of the designated state officials to act. If the thought of such repeal had entered the minds of court or counsel, it would have been a most satisfactory and conclusive answer to the contention that the circuit judges should be required to act. It was left for partisan counsel in this case, with wits sharpened by the bitterness of overwhelming defeat at the polls, to make the amazing discovery. However, in discussing that case in the majority opinion, our learned brother Woodson, at page 456, took occasion to say:

"That the Forty-sixth General Assembly was duly held in the City of Jefferson in the year 1911, but it failed to apportion or redistrict the State into senatorial districts as provided for by Section 7 of Article 4 of the Constitution.

"That under the terms of said section it then became the duty of the Governor, Secretary of State and

the Attorney-General to redistrict it, as therein provided; and on April 18, 1911, they regularly convened in the City of Jefferson for that purpose and took up the matter of redistricting the State into senatorial districts.''

In addition to the application of the rules of construction referred to and the adjudicated cases discussed, we have the right to take into consideration the consequences of a given construction where the meaning of the amendment is doubtful. As a general rule courts have nothing to do with the consequences of their decisions; but the meaning of the amendment being not entirely clear, the question of whether or not the people intended by such amendment a construction contended for, reference to the consequences is not out of place to show what was the real intent of the people in adopting the amendment, because the people cannot be presumed to have intended undesirable or disastrous consequences as the effect of such amendment.

Perhaps the least of the difficulties resulting will be the disadvantages suffered by the people of the State in having to endure, possibly for years, the outgrown senatorial apportionment of 1901. Politically unfair and made in utter disregard of the mandates of the Constitution in the beginning, due to the marked tendency to city dwelling, it has become more unfair and unrepresentative as the years have passed. Even if the majority opinion is decisive of the right of the people to redistrict the State by the initiative and reliance can be placed on adherence to the decision in future cases, it is difficult to see how any redistricting bill can be carried at the polls.

Disastrous Consequences.

It is altogether probable that the reason the General Assembly has failed to redistrict the State heretofore is because even the Legislature is too numerous a body to come to an agreement as to the territory to be included in the several senatorial districts. The motives of the proponents of any given arrangement are always subject to suspicion of private political fortunes to be

290 Mo.—39

promoted or special legislative interests to be subserved, and the larger the number of people to be satisfied by any given arrangement the less the likelihood of agreement. Such likelihood of agreement would be lessened almost to the vanishing point if the voters of the entire State had to pass on any given arrangement. The people in the country probably would suspect that the cities were given too much representation, and *vice versa.* This attitude may explain the failure of the General Assembly in the past to exercise its power, and such attitude would more than likely defeat any plan of senatorial redistricting submitted to popular vote.

But by far the most serious consequences to be considered because of the conclusion reached in the majority opinion is its effect on restrictions upon and grants of legislative authority made by the Constitution itself and delegations of legislative authority by the General Assembly. The holding of the majority opinion is that all grants of legislative power are withdrawn from all agencies, except the Legislature and the people themselves, and is evidenced by the following language from the majority opinion:

"The sole idea was to centralize legislative authority or power in a given and single forum, so that the referendum and initiative rights of the people would be preserved. They did not intend, nor do thoughtful people think that they intended, to utterly destroy the reservations and restrictions of the document that they were amending. As said, their purpose was to center all legislative power or authority (as we have defined it supra) in one single legislative forum, so that they could invoke either the referendum or the initiative. That forum they made the General Assembly. This excludes legislative power or authority from other independent branches or officers of the government, and the thing before us is a constitutional grant of legislative powers to three executive officers."

The majority were compelled so to hold in order to reach the conclusion that the constitutional grant of

conditional or alternative power to the designated state officials to redistrict the State was withdrawn. If any exceptions be recognized, then the force of the reasoning is immediately destroyed. But in so holding the opinion holds too much, and if the opinion be followed it visits upon our State most confusing and disastrous consequences.

Following the decision to its legitimate conclusion, what becomes of constitutional and statutory delegation of legislative powers to cities, school districts and special road districts in levying taxes? What becomes of legislative powers bestowed by the Constitution upon, or delegated by the General Assembly to, municipalities enabling them to pass ordinances on the multitude of subjects provided for in 'their general and special charters, including the police power itself? If the Constitution itself is changed and grants of legislative power directly provided for therein are withdrawn, what becomes of delegations of legislative authority made by the General Assembly prior to the initiative-and-referendum amendment? Is the creature of the Constitution, the General Assembly, greater than the Constitution itself? Clearly not. All such powers must be held also to have been centralized ''in a given and single forum, so that the referendum and initiative rights of the people would be preserved,'' as ruled in the majority opinion.

Let us hope that delegations of legislative powers by the General Assembly subsequent to the adoption of of the amendment have escaped the disastrous consequences of the reasoning of the opinion, because as to them the people have had the right to exercise the referendum and, having failed to exercise it, such powers may be regarded as safe from the far-reaching effects of the decision.

However, conceding that the majority opinion has soundly ruled that all legislative powers have been centralized ''in a given and single forum, so that the referendum and initiative rights of the people would be preserved,'' it is a very serious question whether the Gener-

al Assembly, since the adoption of Section 57, Article IV, has been possessed of power to delegate any legislative duties whatever, because the referendum could not apply to the exercise of such delegated legislative powers. If so, what becomes of the legislative powers of cities of the first and second classes delegated since 1908? What becomes of the powers of the Public Service Commission to fix reasonable rates for public utility service? These acts are legislative in character. What becomes of the legislative powers of the numerous other boards and commissions created since 1908?

Already reports of the confusion resulting from the ruling made in this case are reaching our ears. Under the 1901 redistricting act the city of St. Louis has six senators and under the 1921 apportionment eight. This caused a rearrangement of the senatorial districts, a change in the wards and new election precincts. Some of the new election precincts are in two different senatorial districts as laid out in 1901, and great apprehension is felt that the necessary changes cannot be made before the election of delegates to the Constitutional Convention. Doubtless the same situation exists in Jackson County, to which two additional senators are assigned by the 1921 act. It will indeed be a fearful price to pay if the effect of the majority opinion is to endanger the Constitutional Convention itself.

I will not enumerate further examples. Carried to its logical conclusion, the majority opinion is startling and revolutionary in its effect. As is said in the majority opinion on the question of the effect of Section 57, Article IV, on restrictions on legislative power, "If this amendment withdrew one restriction, it withdrew all, and it is unthinkable to say that such was the intent of the people." And so I say to as grants of legislative power, not only to the designated state officials, but to cities, counties, school districts, commissions, boards and other bodies, that if this amendment withdrew one pre-existing grant of legislative power, it withdrew all. It may have destroyed the subsequent power to delegate

legislative duties. It is unthinkable to say that such was the intent of the people.

The ordinary mind is sufficiently endowed with imagination to visualize the disastrous, yes, appalling, consequences to our established institutions that will follow adherence to the rule announced.

HIGBEE, J. (dissenting).—The leading, if not the sole, question in this case is: Was the power specially delegated to the Governor, Secretary of State and Attorney-General by Section 7 of Article IV of the Constitution, repealed by Section 57 thereof, the Initiative and Referendum, adopted in 1908?

In the brief and printed argument by relator's distinguished counsel, it was broadly contended that Section 57, by necessary implication, repealed Section 1 of Article IV, by which the legislative power **Petitioner's** of the State, ''subject to the limitations here- **Position.** in contained, shall be vested in a Senate and House of Representatives to be styled The General Assembly of the State of Missouri,'' as also Section 7 of that article, and that by Section 57 the people reinvested the General Assembly with all legislative *authority,* subject only to the *power* reserved by the people to propose legislation and amendments, and to approve or reject at the polls any act of the legislative assembly.

At the oral argument and in their reply brief, however, this contention was abandoned, because it was seen that it resulted in the abrogation of all the restrictions of the Constitution on the legislative authority of the General Assembly. The argument proved too much. Much stress was also laid on the supposed distinction between the word ''power'' in Section 1, and the word ''authority'' in Section 57. It was contended that the distinction was vital in the consideration of the question, but as these words are used interchangeably in Section 57, it must be conceded that the difference in meaning of these words as used in our Constitution is more fanciful than real. So the controversy on the part

of the relator at the oral argument rested on the contention that Section 57, by necessary implication, repealed the special power delegated to the three state officers to redistrict the State senatorially on the failure of the General Assembly to perform that legislative duty.

In the majority opinion it is said that the legislative intent of the framers of the amendment was, ''to gather together and lodge in one legislative forum all legislative power or authority. If this was the intent and purpose of the amendment, then it gathered to the legislative forum the conditional grant of legislative power to those three executive officers. The legislative authority of the State includes all legislative authority existing at the time. If all legislative authority were vested in a given legislative forum (including the General Assembly and the Governor) the legislative authority of these three executive officers was gathered unto the fathers and must be for naught held. 'The legislative authority' needs no defining. It is in substance *all* legislative authority. All legislative authority, must be construed in the light of the reservations and restrictions upon legislative action. As to reservations and restrictions, the intent of the framers was to preserve them, but it is as clear that their intent was to so concentrate legislation or legislative acts, as to give them power to supervise them either by the referendum or the initiative. This was the very reason for the amendment. All concede, and if not, the cases and the Constitution so hold, that the redistricting of the State is a legislative act. If the framers of the amendment had not thought that they had gathered into one bunch all legislative authority or power, and placed it in one channel, so that they could review the same, if dissatisfied, they might have extended both the referendum and initiative. They thought, and they intended to place 'the legislative authority' in such position as to enable them to review by referendum all acts of a legislative character. If this be the intent of

*One Legislative Forum.*

the amendment, then it conflicts with the proviso, or last
clause of Section 7 of Article IV.''

The learned judge does not inform us how he knows
what the framers of Section 57 thought or intended, or
''that their purpose was to gather together and lodge in
one legislative forum all legislative power,'' or, as else-
where expressed in the opinion, ''the sole idea was to
centralize legislative authority or power in a given and
single forum so that the referendum and initiative rights
of the people would be preserved. They did not intend,
nor do thoughtful people think that they intended, to
destroy the reservations and restrictions of the docu-
ment that they were amending.''

We disclaim any knowledge in the premises other
than can be gained by reading and interpreting the
amendment in the light of the time-honored and time-
tested rules of construction, which, it was ad-
Construction. mitted at the argument, were the same as in
the construction of statutes. ''In the main, the general
principles governing the construction of statutes apply
also to the construction of constitutions.'' [12 C. J. 699,
sec. 42.]

Section 1 of Article IV reads: ''The legislative
power, subject to the limitations herein contained, shall
be vested in a Senate and House of Representatives, to
be styled 'the General Assembly of the State of Mis-
souri.' '' If it was thought necessary to insert the limi-
tation clause in this section, and if Section 57 gathers up
all the legislative power of the State and centralizes it
in the General Assembly, why did not the framers of the
amendment preserve therein these essential limitations?
Why leave such vital restrictions to be supplied by the
extra-hazardous chance of judicial construction? In other
words, if Section 57 was intended as a substitute for
Section 1 of Article IV, why did not the framers thereof
write therein ''subject to the limitations herein con-
tained?''

Now the simple truth is that Section 57 no more re-
peals Section 1 or the proviso of Section 7 of Article IV,

then the Sermon on the Mount abrogates the Ten Commandments. Indeed, the Master gave a new interpretation to the Commandments. Envy of another's goods is larceny; lust is adultery; hatred is murder. Still, the Law, written by God's finger on the Tables of Stone, remains the Gibraltar of Civilization.

It is believed that if this action on the part of the state officials were not pregnant with political consequences, there would be no shade of difference of opinion among lawyers in the solution of this question.

Political Questions. But, when political questions get into court, as they inevitably must, it must be confessed that we are likely to be unconsciously influenced by our political predilections. This was conspicuously demonstrated by the deliverance of the Electoral Commission in the famous controversy over the great stake at issue in the Hayes-Tilden election contest.

Happily, however, the identical question in this case was directly involved and expressly decided by this court against relator's contention when political considerations and party control of the State Senate were not involved. In the Halliburton case, 230 Mo. 408, the Secretary of State refused to file petitions for the enactment by the initiative of a measure which this court held was a legislative act to redistrict the State senatorially. A mandamus was asked to compel the Secretary of State to file them. Fox, C. J., delivering the opinion of the court, said in part, at page 431:

The Halliburton Case.

"Manifestly before the senatorial districts can be divided in the manner as suggested in the so-called proposed constitutional amendment, Section 7 of Article IV of the Constitution of this State must be amended and so changed as to authorize, by the initiative, the people at the polls to divide the senatorial districts. . . . In other words, the exercise of the power by the initiative to alter and divide the senatorial districts by a legislative enactment cannot have the force and effect of dislodging the power vested by the Constitution under Section 7 of

Article IV, providing for the apportionment of senatorial districts. Before the power to alter and divide the senatorial districts can be exercised there must be an appropriate amendment to the Constitution dislodging the power to so divide and alter, such districts under the present Constitution and laws of this State." And on page 438 the learned Chief Justice said:

"In other words, as applicable to this subject they must include in the petitions the full text of the amendment that is desired to be made as to Section 7 of Article 4 of the Constitution of this State changing and altering the method and plan of redistricting. the senatorial districts, and instead of delegating the power to the General Assembly, *and in the event of its failure to perform the duty to certain designated officials. That such districts shall be divided by a law enacted through the initiative and referendum providing for the division of such senatorial districts.* After having amended the Constitution in this manner then the way is perfectly clear to propose through the initiative, not a constitutional amendment, but a legislative act dealing with the subject of dividing and defining the boundaries of the senatorial districts in this State."

Judge GRAVES concurred in a separate opinion, saying in part: "I fully concur in all that Fox, C. J., has written in this case. The points made by him are unanswerable." *In other words, this court held that the people could not redistrict the State senatorially by the initiative until Section 7 of Article IV, including the proviso, was amended;* thus recognizing that said proviso was still a live measure. *Now it is held that the three state officers cannot exercise their constitutional prerogative because it is repealed by Section* 57.

. In State ex rel. v. Hitchcock, 241 Mo. 433, 1. c. 457, Judge WOODSON, delivering the opinion of the court, said in part:

"Not only that, but the very same section of the Constitution which authorizes and empowers the Legislature proper to apportion and redistrict the State in-

to senatorial districts, also provides for and empowers this body of three state officials to redistrict it in case the General Assembly neglects or fails to do so.

"That being true, and both deriving their authority from the same source, and performing precisely the same duties, it must stand to reason, that if the labors of the General Assembly are legislative, then the work of this body must also be legislative in character.

"We call the one an act of the General Assembly, the other the statement of the Miniature Legislature.

"These views also find support in the cases of State ex rel. v. Patterson, 229 Mo. 373, l. c. 382, 383, 386, 387, 388, 391 to 396; and State ex rel. v. Roach, 230 Mo. 408, l. c. 428, 431, 433, 434, 435, 438, 439.''

In State ex rel. v. Patterson, 229 Mo. 373, in an opinion handed down June 21, 1910, Judge GRAVES said in part: "Of course, as to the senatorial districts, if the Legislature fails to apportion, the apportionment may be made by other officers mentioned in Section 7 of Article IV of the Constitution."

In the case last cited, the then Assistant Attorney-General, now Chief Justice of this court, in his brief for the State, said: "The Constitution expressly directs the Legislature, in Section 7 of Article IV, to redistrict for senators every ten years, and provides for the contingency in the event of the failure upon the part of the Legislature."

Political considerations were not involved in the judgments of the eminent judges who then adorned this bench. I am content with their conclusions and believe they preclude further argument. Those judgments speak for themselves and foreclose further controversy on this question. If the maxim *res ipsa loquitur* be not applicable, the doctrine of *stare decisis* should be respected. If, however, this question were *res integra,* there could be but one answer. Here is a special provision in Section 7, empowering the three state officers to act in case the General Assembly should fail to redistrict the State senatorially. Was that specially delegated authority re-

pealed by implication by Section 57? Relator's counsel, in their brief, admit that a redistricting of the State by the "miniature legislature" cannot be referred to the people "because the power to refer contained in Section 57 applies only to 'any act of the legislative assembly.''

The amendment does not read "any act of legislation," but "any act of the legislative assembly." The framers of the amendment knew the three state officials had the power to legislate; that is, to redistrict the State in the contingency mentioned in Section 7; they also knew that cities, towns and villages had the power to enact ordinances and police regulations. The express language of the amendment confines the right to exercise the power of the referendum to "acts of the legislative assembly;" thus recognizing and excluding from its operation the power specially delegated by the proviso in Section 7, as well as the powers of municipalities to legislate. Did Section 57 gather up all the legislative powers of the Public Service Commission as well as of the cities, towns and villages and vest those powers in the Legislature as a single forum, so that the people may exercise control over that class of legislation by the referendum?

*Intendment. Construction:*

We quote from 12 Corpus Juris, 707, section 55: "The presumption and legal intendment is that each and every clause in a written constitution has been inserted for some useful purpose, and therefore the instrument must be construed as a whole in order to ascertain both its intent and general purpose and also the meaning of each part. It follows, therefore, that, as far as possible, each provision must be construed so as to harmonize with all the others, yet with a view to giving the largest measure of force and effect to each and every provision that shall be consistent with a construction of the instrument as a whole. Different sections, amendments, or provisions relating to the same subject, must be construed together and read in the light of each other."

In Rosencrans v. United States, 165 U. S. 257, near the foot of 262, Justice Brewer, speaking for the court,

said: "In other words, where Congress has expressly legislated in respect to a given matter that express legislation must control, in the absence of subsequent legislation equally express, *and is not overthrown by any mere inferences or implications to be found in such subsequent legislation.*"

In Rodgers v. United States, 185 U. S. 83, at foot of page 87, Justice BREWER again said: "It is a canon of statutory construction that a later statute, general in its terms and not expressly repealing a prior special statute, *will ordinarily not affect the special provisions of such earlier statute.* In other words, where there are two statutes, the earlier special and the later general— the terms of the general broad enough to include the matter provided for in the special—the fact that the one is special and the other general *creates a presumption that the special is to be considered as remaining an exception to the general,* and the general will not be understood as repealing the special, unless a repeal is expressly named, or unless the provisions of the general are manifestly inconsistent with those of the special."

These established canons of construction have been fully recognized by this court. In Folk v. St. Louis, 250 Mo. 116, 136, we quoted approvingly from 36 Cyc. 1151 (IV), as follows: "Where there is one statute dealing with a subject in general and comprehensive terms and another dealing with a part of the same subject in a more minute and definite way the two should be read together and harmonized, if possible, with a view to giving effect to a consistent legislative policy; but to the extent of any necessary repugnancy between them, the special will prevail over the general statute. Where the special statute is later, it will be regarded as an exception to, or qualification of, the prior general one; and where the general act is later, *the special will be construed as remaining an exception to its terms,* unless it is repealed in express words or by necessary implication."

In 36 Cyc. 1073 (III), this clear rule is stated: "Where two legislative acts are repugnant to, or in conflict with,

each other, the one last passed, being the latest expression of the legislative will, must govern, although it contains no repealing clause. But it is not sufficient to establish such repeal that the subsequent law covers some, or even all, of the cases provided for by the prior statute, since it *may be merely affirmative, or cumulative, or auxiliary.* Between the two acts there must be plain, unavoidable, and irreconcilable repugnancy, and even then the old law is repealed by implication only *pro tanto,* to the extent of the repugnancy. If both acts can, by any reasonable construction, be construed together, both will be sustained. *Two statutes are not repugnant to each other unless they relate to the same subject. Furthermore it is necessary to the implication of a repeal that the objects of the two statutes be the same. If they are not, both statutes will stand, although they may refer to the same subject."* These well known rules are recognized in Manker v. Faulhaber, 94 Mo. 430; State ex rel. v. Schramm, 272 Mo. 541, 564, and many other cases.

If we look this amendment squarely in the face, in the light of these rules of construction, we cannot fail to see its purposes. Section 1 of Article IV had already clothed the General Assembly with all legislative power "subject to the limitations herein contained." It already had ample authority to legislate. What was the mischief sought to be remedied by the amendment? It is trifling to say that this amendment was adopted because the people distrusted the power vested in the Governor, Secretary of State and the Attorney-General to redistrict the State senatorially in the event the Legislature failed to perform that duty. It is true that this decennial redistricting by the three state officials had been done so as to maintain party control of the Senate, except in case of a political earthquake. It is also true that complaints were justly made on account of these grossly partisan measures, but every one knows this had nothing to do with the adoption of the amendment, because the long-time dominant party would never have consented to any

measure that might relax its strangle-hold on the State Senate.

This reformatory measure had been adopted in Oregon and other states, where, so far as I am informed, our peculiar mode of redistricting the State did not obtain. In fact, the adoption of the initiative and referendum in various states of the Union and in other countries was due to other causes. The people desired a larger measure in general legislation. The complaint was that legislatures were subject to the influences of corrupt lobbies and were domineered by corporations. [See the criticism of the Warrensburg Standard-Herald of June 19, 1903, in State ex rel. v. Shepherd, 177 Mo. 205, 209, for which this court imposed a fine of $500.] They enacted vicious legislation and failed to pass laws demanded by the people. To paraphrase the language of the Book of Common Prayer, ''they have done those things which they ought not to have done, and have left undone those things which they should have done.'' It is common knowledge that the people desired to correct these evils, to so amend their constitutions that they could initiate legislation and reject vicious enactments of the Legislature.

The title prefixed to the resolution submitting the amendment, Section 57, reads: ''Joint and concurrent resolution submitting to the qualified voters of Missouri an amendment to the Constitution thereof *concerning the Initiative and Referendum.*'' [Laws 1907, p. 452.]

The amendment reads: ''The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, *but* the people reserve to themselves power to propose laws and amendments to the constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly,'' etc.

On what theory is the broad claim made that the framers of the amendment intended that it should gather

State ex rel. Lashly v. Becker.

One Legislative Forum.

together and resume all the legislative power of the State and lodge that power in one legislative forum? How is that assumption deduced? That purpose must be clearly expressed or must be necessarily and inevitably implied from the language of the amendment, otherwise the contention will be disallowed. If, however, the amendment accomplished the revolution claimed in the majority opinion, then it repealed Section 1 of Article IV, and with it went all the restrictions; in other words, it cleaned the slate and re-invested the Legislature with unbridled authority to legislate, reserving to the people the right of the initiative and referendum. But we look in vain in the amendment for such purpose or intent.

Keeping in mind the fact that the Legislature was already vested with power to legislate, "subject to the limitations herein contained," it is manifest that the clause "the legislative authority is vested in a legislative assembly" is merely affirmative of Section 1 of Article IV of the Constitution. It is not repugnant to nor inconsistent with the power already so vested in the Legislature, but merely affirmative thereof. This enactment, being general and later than the special power delegated to the Governor, Secretary of State and Attorney-General by Section 7, to act in the event the Legislature failed to redistrict the State, that special power remains unaffected. As heretofore quoted from 36 Cyc. 1073, it is not sufficient to establish such repeal that the subsequent law covers some, or even all, of the cases provided for by the prior statute, since it may be merely *affirmative, or cumulative, or auxiliary*. Between the two acts there must be plain, unavoidable and irreconcilable repugnancy, and even then the old law is repealed by implication only *pro tanto*, to the extent of the repugnancy. If both acts can, by any reasonable construction, be construed together, both will be sustained. Two statutes are not repugnant to each other unless they relate to the same subject. *Furthermore it is necessary to the implication*

*of a repeal that the objects of the two statutes be the same. If they are not, both statutes will stand, although they may refer to the same subject."*

The phrase, "the legislative authority is vested in a legislative assembly," is merely introductory or preliminary to what follows; it does not profess to repeal Section 1 of Article IV, and then to reinvest the legislative assembly with legislative power. The clear purpose is expressed in the words, "but the people reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option, to approve or reject at the polls any act of the legislative assembly." Here the clear purpose and object of the amendment is declared not only in the title, but in the body of the amendment. If we look at the mischief to be remedied, the spirit, reason and purpose of the amendment, it is all plain. We know there had been for many years complaints of the failure of legislatures generally to enact laws demanded by the people, and the enactment of vicious legislation. As relator says, there was popular distrust. Such being the mischief to be remedied, and the purpose of the amendment being to remedy that evil, it is obvious that it cannot be considered as repugnant to the power specially delegated to the three state officials as provided in Section 7.

But there is another vice in relator's contention. This special power, so delegated, is not affected by the later act; *"the special will be construed as remaining an exception to its terms."* There is no "plain, unavoidable and irreconcilable repugnancy," and even then the old law is repealed by implication only *pro tanto* to the extent of the repugnancy. "If both acts can, by any reasonable construction, be construed together, they will be sustained. Two statutes are not repugnant *unless they relate to the same subject.* Furthermore, it is necessary to the impli-

Special
Later
Act.

cation of a repeal that the objects of the two statutes be the same. If they are not, both statutes will stand together, although they refer to the same subject." To concede relator's contention would revolutionize the long-established canons of construction.

One further suggestion on this head: If Section 57 gathers up and lodges *all the legislative power of the State* in the Legislature, so that any legislative act can be reconsidered by the people under the referendum, as held in the majority opinion, what then becomes of the power of the Public Service Commission? What also becomes of the power of municipal corporations to enact ordinances and police regulations for the health, peace and safety of their inhabitants? What becomes of the charter powers granted to our large cities to enact legislation? Like the proviso to Section 7 of Article IV, these powers "have all been gathered to their fathers."

Perhaps we may better understand the majority opinion, running, as it does, counter to all the canons of construction (except in emergencies like the present), by referring to a few of our earlier decisions and political cases. Shackled as we are with partisan bias and prejudice, it is humiliating to confess that even judges in our highest courts are unable to divorce law and politics. In emergencies, great and small, they have heard the Macedonian cry and have not been disobedient to the call.

In McKay v. Minner, 154 Mo. 608, decided March 5, 1900, plaintiff contested the defendant's election as judge of the county court. Certain ballots were counted for the defendant on which were indorsed the name or initials of only one of the judges of election. No fraud was charged. Judge SHERWOOD, delivering the opinion, held that although the ballots were deposited in the ballot boxes they could not be counted. In Hehl v. Guion, 155 Mo. 76, decided March 15, 1900, the plaintiff contested the election of the defendant for the office of constable. Ballots were cast and counted for the defendant on which were indorsed the initials of

only one of the election judges. No fraud was charged. Judge VALLIANT delivered the opinion of the court. Syllabus 3 reads: "The law does not say that ballots on which two election judges have not written their names or initials in ink or indelible pencil shall not be counted. It only says that they shall not go into the ballot box. The rejection, therefore, of a genuine ballot on which the judges' initials do not appear, or on which the initials of only one judge appears, or on which the judges' initials are written with erasable pencil instead of ink or indelible pencil, is error."

In Rollins v. McKinney, 157 Mo. 656, the plaintiff contested the election of the defendant to the office of constable. The defendant's name was imprinted by a rubber stamp on eighteen of the Republican tickets. This court declared those ballots should not be counted for the defendant.

In Bradley v. Cox, 271 Mo. 438, plaintiff contested the election of the defendant as judge of the Springfield Court of Appeals. Plaintiff was regularly nominated for the office and his name should have been printed on all the Democratic tickets. The name of Arch A. Johnson, a distinguished jurist of Greene County, by some oversight, was printed on all the Democratic tickets in Maries County instead of Judge Bradley's, as the party candidate for the office. Judge Bradley's name was not on any ticket. The opinion of the court was written by J. T. BLAIR, now Chief Justice of this court, declaring that the 1311 tickets on which the name of Judge Johnson was printed should be counted for Judge Bradley, and he was declared elected. It is not clear whether this result was reached on the principle that equity regards that as done which was intended to be done, or on the other principle that Democrats are always presumed to vote their ticket straight. The court evidently had some difficulty in reaching the result. The issues were novel and a bit embarrassing, but it was very important that the party candidate should be declared elected. Judges BOND, WOODSON and WALKER, dissented.

A superficial reading of the opinions in these and other cases might lead one to conclude that they are inconsistent. But when we consider that in each instance the Republican was ousted—the end to be attained—we see at once that they are all harmonious. On the same principle the majority opinion in the case at bar harmonizes with the Halliburton, Hitchcock and Patterson cases. So also, in the face of an unexpected political exigency, the ruling of the majority in State ex rel. Westhues v. Sullivan, 224 S. W. 327, that in adopting Section 57 of Article IV of the Constitution we also adopted the construction of the Supreme Court of Oregon to the effect that the declaration of the Legislature that the provisions of an act are "necessary for the immediate preservation of the public peace, health or safety," is a question solely for the Legislature and conclusive on the courts, was overruled in the recent case of State ex rel. Pollock v. Becker, 289 Mo. 660.

In State ex rel. Funkhouser v. Spencer, 164 Mo. 23, we prohibited the opening of the ballots boxes and the examination and comparison of the ballots with the list of the voters in an election contest case, in the face of the plain provisions of the Constitution, and rendered those provisions of the Constitution nugatory, just as the majority opinion renders nugatory the proviso in Section 7 of Article IV of the Constitution. This court thus became a city of refuge for election crooks, repeaters, and for the judges and clerks who falsified election returns.

In Montgomery v. Dormer, 181 Mo. 5, Montgomery contested the election of Dormer to the office of Circuit Clerk. The returns showed the latter elected by a majority of one. In the trial court, after preliminary proof that certain persons, thirteen in number, were non-residents, the court permitted the judges of election to testify that they had seen the ballots cast by such persons and that they had all voted for Dormer. It was objected that if the persons so alleged to be non-residents had voted, their ballots, being fraudulent, were not privileged and that they were the best evidence. That objection

was overruled and Dormer, being a Republican, was ousted. On appeal, this court affirmed the judgment, saying, at page 16; "The court had no authority to order the clerk to open the ballots and ascertain how these thirteen men had voted and report the same to the court, neither did the .court have authority to require the clerk to bring the ballots into court for inspection and exposure."

In Gantt v. Brown, 238 Mo. 560, the shoe was on the other foot. Judge GANTT was contesting the election of Judge BROWN to the office of Judge of the Supreme Court. This court, seeing a great light, ruled that the Constitution did not prohibit the examination, inspection and comparison of the ballots with the list of voters when fraud was charged by a Democratic candidate, and overruled the Spencer and Dormer cases. Referring to Section 3 of Article 8 of the Constitution, at page 572, Judge GRAVES said:

"By this section the bar of secrecy is raised by express terms when required in judicial proceedings. By it the election officers are required to keep secret the vote of the voter, but only to such time as he may be required to expose it in the course of a judicial proceeding. When required in a judicial proceeding to tell how a voter has voted such officer must disclose to the public ear the secret of the ballot. We say to the public ear, because courts of justice are public forums, and take no part in star-chamber proceedings. If the election officer must disclose the contents of the ballot, as he must under this constitutional provision, what then becomes of the secret ballot so much discussed in the Spencer case? With its contents exposed by the terms of the Constitution we have but the faded paper securely locked in the ballot box by the Spencer and Montgomery cases, supra."

It is charged by the relator that the redistricting by the three state. officers was not in accordance with the requirements of the Constitution in respect to four of those districts, but this complaint, having no foundation in fact, is ignored in the ma-

**Fair Districts.**

jority opinion. "When any senatorial district shall be composed of two or more counties, they shall be contiguous; such districts to be as compact as may be and in the formation of the same no county shall be divided." [Sec. 9, Art. IV.] The relator virtually confesses that no complaint can be justly made as to thirty of these districts.

It will be admitted that the State cannot be apportioned into districts like a checker-board. A garment cannot be cut out of a piece of cloth without leaving remnants. So, in carving out 34 districts, there are sure to be some of irregular shape, as the State is not rectangular and counties may not be subdivided and each district must have as nearly as may be the same population.

The Constitution in this respect must interpret itself. By Section 11 of Article IV, the State was divided into senatorial districts. The counties of Vernon, Barton, Jasper, Newton and McDonald composed the Sixteenth District. It is neither compact nor convenient, being five counties in length, extending one-third or more of the length of the State along its western border. Here is a concrete interpretation of the requirements of Section 9 of Article IV. Unless the Constitution is at war with itself, this district was as compact and convenient as the organic law required and as the circumstances would permit. No complaint approaching this instance in gravity is made by relator.

No question is raised, however, in the majority opinion, nor indeed could be, as to the fairness, compactness or contiguity of the districts as apportioned by the three state officials. At the argument the learned Attorney-General challenged comparison with any prior apportionment. In reply, one of the relator's distinguished counsel said the redistricting of the State for senatorial purposes is and always has been a political game.

The ruling in the Halliburton case seemed conclusive. Judge GRAVES had concurred therein when there were no storm clouds in the political horizon and de-

clared that the arguments of Fox, C. J., were unanswerable. If we now overrule that and other cases in the face of a political exigency, may it not be said that the political game was simply transferred to this court? The premises considered, can we adopt the majority opinion and hope to merit the confidence and respect of our people? Of course this court has the power to arbitrarily override the Constitution, but I solemnly protest against this monstrous wrong. When it is apparent that our rulings are tossed about like a football to meet political exigencies, we shall justly merit public contempt.

Nearly twenty years ago this court, in the opinion of many good lawyers, brought grave reproach upon itself in reversing outright a judgment rendered in favor of Rube Oglesby against the Missouri Pacific Railway Company in the sum of $15,000 for serious and permanent injuries sustained by him while serving that company as a brakeman. The action of this court was severely criticised, especially by Mr. Shepherd, proprietor of a newspaper published at Warrensburg, where Mr. Oglesby lived. In the exercise of what he deemed his constitutional privilege of free speech, he published an article criticising the court and other public officials. Many thoughtful men believed the criticisms were deserved, especially the people of Warrensburg, who raised the $500 fine imposed by this court and extended to Mr. Shepherd a public reception on his return to the city. This was a more severe condemnation of this court than the criticism published by Mr. Shepherd. In delivering the opinion of the court imposing the fine Judge Marshall (177 Mo. 205, 269) said:

"The courts of this State have been conservative in the extreme, and forbearing to a fault. They have overlooked remarks concerning their acts from lawyers and laymen, that were improper and outside of the pale of the law, preferring, if possible, to attribute the offense to the zeal of counsel or the excitement of the laymen, incident to disappointment of personal hopes and ambitions. They have been considerate of the feelings and

character of others, and have, many times, abstained from the use of strong language, under trying provocation, in deciding cases. And it was proper to do so. But the protection and safety of life, liberty, property and character, the peace of society, the proper administration of justice, and even the perpetuity of our institutions and form of government, imperatively demand that every one, lawyer, layman, citizen, stranger, newspaper man, friend or foe, shall treat the courts with proper respect, shall not attempt to degrade them, or impair the respect of the people, or destroy the faith of the people, in them. When the temples of justice become polluted or are not kept pure and clean, the foundations of free government are undermined and the institution itself threatened. The people have no fear of their courts abusing their power to punish for contempt or in any other respect.''

Very true. "Fine words," however, "butter no parsnips.'' The Temple of Justice should be kept pure and clean; and, like Caesar's wife, should be not only above reproach, but above suspicion.

> ''O wad some Power the giftie gie us
> To see oursels as others see us!
> It wad frae mony a blunder free us
>                  An' foolish notion;''

The criticism which called forth the eloquent protest of our late brother Marshall was provoked by the action of this court in a case that concerned private persons only. [See Oglesby v. Mo. Pac. Ry. Co., 177 Mo. 272.] The case had had a remarkable history. Doubtless the criticism was unjust; I do not know. But the people of this State, as a crowning rebuke, elected Mr. Oglesby to a lucrative state office. In this case, however, the whole State is concerned. What avails a constitution if it can be stricken down by mere inference and, as many believe, in the interest of partisan politics? Such a conclusion should be announced only when good and substantial reasons can be given therefor that will appeal to the common sense and understanding of our people. Mere

sophistry and attenuated theories will not serve the purpose nor save us from reproach.

The foregoing is, in part, the record of this court in cases involving political issues. I feel that the people of Missouri are entitled to read this record. I have said nothing in unkindness, nor set down aught in malice. For the reasons above stated I respectfully dissent from the majority opinion.

JAMES T. BLAIR, C. J. (concurring).—At the time the motion for rehearing was considered and overruled the dissenting opinion of ELDER, J., had been filed. The other dissenting opinions had been, in the main, prepared, but had not been filed. In this situation, in view of the brief time which would remain, in any event, for the nomination of delegates to the Constitutional Convention, the two judges who then proposed subsequently to file dissents, orally presented the legal propositions upon which their views were founded. These were considered by the court, and the motion for rehearing was thereafter overruled. It appeared at this time, and subsequently proved to be true, that propositions were to be advanced which previously had not appeared in the case. In view of this, leave was given for the filing of a concurring opinion. Under this leave the following suggestions are made.

I. In the dissenting opinions filed on December 8th and 9th, respectively (after the motion for rehearing was overruled), the position seems to be taken that under the rule announced in the majority opinion it must

Legislative Power: Delegation: To Municipalities and Legislative Agents.

follow that delegations of power to municipal corporations and of authority to the Public Service Commission, and the like, are invalid and unconstitutional; that this result is so disastrous as to show the amendment of 1908 was not intended to be construed as the majority opinion construes it.

The Attorney-General, and his assistants, whose briefs and arguments in this case disclose a painstaking,

lawyerlike and dispassionate study of the case and the questions in it, did not advance the argument now made in the opinions mentioned. The dissenting opinion of ELDER, J., which carefully discusses the issues, does not contain such an argument. The motion for rehearing contains nothing of the kind. Nevertheless, the point is now made and the views of our brethren are always entitled to the most respectful consideration.

It is believed that the argument referred to overlooks the nature and origin of the powers which are now said to be threatened by the rule of the majority opinion. The argument is founded upon the assumption that, for instance, when the Legislature invests a city with authority to pass ordinances for the regulation of matters of local concern, it is thereby investing the city with a part of the "legislative power" in the sense in which those words are used in the Constitution, and that when a city council passes an ordinance it exercises a part of the "legislative power" described in the Constitution. Unless this assumption is made, the argument falls of its own weight. That is, unless it is true that the power exercised by the city in passing ordinances is a part of the "legislative power" in the constitutional sense, it cannot be contended it is affected by the rule of the majority opinion, which deals with the legislative power in no other sense. The question arises whether the thing assumed to be true is true in fact. The question is one which has had the attention of courts and text-writers. As early as 1847 this court discussed it in Metcalf v. St. Louis, 11 Mo. l. c. 105, in this wise:

"Here is clear and explicit delegation of power to pass the ordinance in question. The ordinance appears on its face to have been regularly passed and approved. If the ordinance adopted on this subject be void for want of legal authority, it will follow that the mayor and council can pass no ordinance whatever; and, that the General Assembly can impart no such power to any one corporation. This cannot be seriously contended. We are referred to the 1st section of the 3rd article, Constitution

of this State, which declares that, 'the legislative power [of the government] shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.' We can see no conflict between this clause and the authority conferred by the General Assembly on the mayor and the city council of St. Louis. The grant of power to pass ordinances for the government of the City of St. Louis, not inconsistent with the Constitution and laws of the State, *is not a delegation of the law-making power of the government* delegated by the Constitution to the General Assembly.'' (Italics ours).

It therefore appears that this question was decided about sixty-one years before Section 57 of Article IV was adopted, in 1908, and that this court then held the law to be exactly contrary to the assumption made in the argument being considered. This court has uniformly held that the General Assembly cannot delegate its legislative power. It has as uniformly held that municipal corporations lawfully could be invested with the powers now in question. The same holdings are found in the decisions of every state. It is impossible to harmonize these holdings if it be true that the municipalities exercise a part of the legislative power, in the constitutional sense, under legislative delegation.

The rule announced in the Metcalf case is not only the law in Missouri but is generally recognized. Mr. Cooley (Const. Lim., 7 Ed., pp. 264, 265) gives his views as follows:

''It has already been seen that the legislature cannot delegate its power to make laws; but fundamental as this maxim is, it is so qualified by the customs of our race, and by other maxims which regard local government, that the right of the Legislature, in the entire absence of authorization or prohibition, to create towns and other inferior municipal organizations, and to confer upon them the powers of local government, and especially of local taxation and police regulation usual with such corporations, would always pass unchallenged. The

legislature in these cases *is not regarded·as delegating its authority* because the regulation of such local affairs as are commonly left to local boards and officers *is not understood to belong properly to the State;* and when it interferes, as sometimes it must, to restrain and control the local action, there should be reasons of state policy or danger of local abuse to warrant the interposition." (Italics ours).

Mr. Dillon in his work on Municipal Corporations (5 Ed.) sec. 573, says: "Although the proposition that the legislature of a state is alone competent to make laws is true, yet it is also settled that it is competent for the *legislature to delegate to municipal corporations the power to make by-laws and ordinances, with appropriate sanctions."*

Mr. McQuillin, in his work on Municipal Corporations, sec. 124, says: "And while the rule is also fundamental that the power to make laws 'cannot be delegated, the creation of municipal corporations to exercise local self-government has never been held to violate this principle."

Mr. McQuillin quotes from and cites a decision of the Supreme Court of the United States in which Mr. Chief Justice FULLER·says: "It is a cardinal principle in our system of government that local affairs shall be managed by local authorities, and general affairs by the central authority, and hence, while the rule is also fundamental that the power to make laws cannot be delegated, the creation of municipalities exercising local self-government has never been held to trench upon that rule. Such legislation is not regarded as a transfer of general legislative power, but rather as a grant of authority to prescribe local regulations, according to municipal practice, subject, of course, to the interposition of the superior in cases of necessity." [Stoutenburgh v. Hennick, 129 U. S. l. c. 147.]

In 19 Ruling Case Law, p. 706, sec. 17, it will be found that the text closely follows the decision last cited. In 12 Corpus Juris, pp. 859, 860, sec. 357 (2), the rule is

stated: "In general the legislature may delegate to municipal corporations, and to proper officers of such corporations, all powers incident to municipal government, whether legislative or otherwise, without violating the rule against a delegation by the legislature of its law-making power."

In State v. Hayes, 61 N. H. l. c. 314 et seq. (cited with approval by Mr. Dillon), is a discussion of the origin and powers of municipal corporations which gives a legal and historical view of the subject as related to the present question and discloses the considerable antiquity of the doctrine laid down in the authorities which are here cited. In those authorities will be found cited numerous decisions of the courts.

The authorities are harmonious. The power to invest municipalities with authority to enact ordinances is a part of the legislative power in the constitutional sense. That power the Legislature cannot delegate. The power which the municipalities exercise under legislative authority is not a part of the "general legislative power," according to the Supreme Court of the United States; is "not understood to belong properly to the State," according to Mr. Cooley; and is not a part of the "law-making power of the government delegated by the Constitution to the General Assembly," according to this court when construing our own Constitution. In view of these authorities, and of this court's declaration upon the subject which was the law of this State when the Constitution of 1875 and Section 57 of Article IV were drafted and adopted, it is necessary to conclude that the assumption previously referred to is incorrect and that the argument dependent upon it falls with it.

The suggestion is also made that the rule in the majority opinion may destroy the Public Service Commission. The argument, again, assumes that the power exercised by that body is legislative power in the constitutional sense. This appears from reasons like those given in considering municipal corporations. The power exercised by the Public Service Commission is adminis-

trative, and not legislative. The law was passed by the General Assembly. Its administration and execution are confided to the Commission. The power to legislate includes the power to exercise discretion as to what the law shall be. It is distinct from authority or discretion in the execution of a law. This is the settled doctrine in this country. [Field v. Clark, 143 U. S. l. c. 693, 694; Buttfield v. Stranahan, 192 U. S. l. c. 496; Union Bridge Co. v. United States, 204 U. S. 384, 385; United States v. Grimaud, 220 U. S. l. c. 517, 518, 519, 520; Beale & Wyman on Railroad Rate Regulation, secs. 1403, 1404, 1408; Village of Saratoga Springs v. Saratoga G., etc., Co., 191 N. Y. l. c. 144, 145; Int. Com. Comm. v. Transit Co., 224 U. S. l. c. 214, 215.] The rule is that the Legislature may constitute administrative agencies which it may empower to carry out a law fixing rates and regulations. The Legislature must make the law. The administrative board administers the law—nothing more. This doctrine is no longer questioned, as we understand the courts and text-writers. It follows that the power exercised by the Public Service Commission and the boards referred to in the dissenting opinions is not legislative power in the sense of the majority opinion and is therefore not affected by it. It is clear that the power to authorize municipal corporations to act in matters of local concern, and the power to establish a public service commission for the better administration of the law regulating public service corporations, are both constituent parts of the "legislative power" as that is defined in the Constitution. The words "the legislative authority," as used in Section 57 of Article IV, include them as much as they include any other part of the legislative power. It no more repeals or affects those powers or acts passed under them than it repeals or affects acts passed under any other part or branch of the existing legislative power as it stood under our Constitution at the time Section 57 of Article IV was adopted.

State laws authorizing municipalities to enact ordinances and establishing administrative boards are as

much subject to the referendum as any other laws and may as readily be proposed by the initiative. Of course, it is not meant to be implied in the reasoning of the dissenting opinions that Section 57 of Article IV would authorize the voters of the State at large to initiate an ordinance (for instance) for the city of Kirksville or to refer to the voters of the State at large an ordinance passed (for instance) by the local authorities of the city of Joplin.

In view of the established principles to which reference has been made and the unbroken line of authority supporting them, as well as their almost axiomatic character, we have reached the conclusion that the position taken in this connection in the two dissenting opinions cannot be maintained.

II. In the correct use of a judicial decision as a precedent at least two things must be understood by the court so using it. It is necessary that the court know (1) what the question is which is then before it for decision, and (2) what question was decided in the decision invoked. as a precedent.

Stare Decisis: Halliburton Case.

The first can be learned from the record of the pending case. The second must be discovered from the previous decision itself. In this case the decision in the Halliburton case is cited as a precedent. The dissenting opinions earnestly argue to the conclusion that the opinion in that case shows that the question now before us was decided in that case in a certain way. To reach this conclusion it is necessary for those who champion it to construe the language of that opinion. In view of the fact that the meaning given to the Halliburton decision in the dissenting opinions is quite different from that given to it in the majority opinion, an examination of the law applicable to the interpretation of judicial decisions when their use as precedents is proposed, and an application of that law to the Halliburton decision, may not be out of place.

One of the hornbook rules (Black's Law of Judicial Precedents, sec. 11, p. 49) is: ''The language of a judicial decision is always to be construed with reference to the circumstances of the particular case and the question actually under consideration; and the authority of the decision, as a precedent, is limited to those points of law which are raised by the record, considered by the court, and necessary to the determination of the case.''

Continuing, Mr. Black says:

''This is a very fundamental principle in the theory of judicial precedents, and has been repeatedly recognized and asserted by the courts, as well as by theoretical text-writers. 'A law or rule of law made by judicial decisions,' says Austin (2 Austin, Jurisprudence, Campbell's Ed., sec. 900), 'exists nowhere in a general or abstract form. It is implicated with the peculiarities of the specific case or cases, to the adjudication or decision of which it was applied by the tribunals; and in order that its import may be correctly ascertained, the circumstances of the cases to which it was applied, as well as the general propositions which occur in the decisions, must be observed and considered. The reasons given for each decision must be construed and interpreted according to the facts of the case by which those reasons were elicited, rejecting as of no authority any general propositions which may have been stated by the judge, but were not called for by the facts of the case or necessary to the decision. The reasons when so ascertained must then be abstracted from the detail of circumstances with which in the particular case they have been implicated. Looking at the reasons so interpreted and abstracted, we arrive at a ground or principle of decision, which will apply universally to cases of a class, and which, like a statute law, may serve as a rule of conduct. Without this process of abstraction, no judicial decision can serve as a guide of conduct or can be applied to the solution of subsequent cases. For as every case has features of its own, and as every judicial decision is a decision on a specific

case, a judicial decision as a whole, or as considered in concrete, can have no application to another and therefore a different case.' "

This rule is not new in the jurisprudence of this State. In State ex rel. v. St. Louis, 241 Mo. l. c. 238 et seq., in an opinion written in Banc by LAMM, J., and concurred in by VALLIANT, C. J., and KENNISH, FERRIS, BROWN, WOODSON and GRAVES, JJ., is found an announcement of the same doctrine. In that case it was said:

"There is a pronounced line of demarcation between what is *said* in an opinion and what is *decided* by it—between arguments, illustrations and references on one side and the judgment rendered on the other. The language used by a judge in his opinion is to be interpreted in the light of the facts and issues held in judgment in the concrete case precisely as in every other human document. . . . It would be a wide and very mischievous departure from correct canons of interpretation to disconnect general language from the issues and facts of a given case and to apply that general language mechanically or automatically to the different facts and different issues of another case; for the sense must be limited according as the subject requires, and words take color from their context."

The opinion then quotes from cases and texts which disclose that the doctrine is ancient and universal. Particularly did the court approve a decision in Lucas v. Commissioners, 44 Ind. l. c. 541, and quoted from it at some length. The rule can be found in that quotation, together with sound reasons for it. This court frequently has approved the rule. [Greene Co. v. Lydy, 263 Mo. l. c. 91; Skilman v. Clardy, 256 Mo. l. c. 322; Pocoke v. Peterson, 256 Mo. l. c. 518; Bender v. Weber, 250 Mo. l. c. 561; Lorenzen v. Railroad, 249 Mo. l. c. 191.] The authorities elsewhere are uniform. [People v. Winkler, 9 Cal. l. c. 236; In re Johnson, 98 Cal. l. c. 542; Larzelere v. Starkweather, 38 Mich. l. c. 100, 101; Holcomb v. Bonnell, 32 Mich. l. c. 8; Hogan v. Board, 200 N. Y. l. c. 370; Crane v. Bennett, 177 N. Y. l. c. 112; Wright v. Nagle, 101

U. S. l. c. 796, 797; Cohens v. Virginia, 6 Wheat. l. c. 399, 400; Swan v. Justices, 222 Mass. l. c. 545;. City v. Fant, 96 S. C. l. c. 96.] Numerous other decisions lay down the same rule. We have .found none which proposes any other. The necessity for the citations made arises out of the fact that the rule seems to be negatived by the dissenting opinions in that they reach a conclusion which it is thought cannot be reached if the existence of the rule in question is conceded. It is in view of this apparently necessary implication in the dissenting opinions and out of respect for the views of the dissenting brethren that the authorities again have been examined. We find no denial of the rule except the denial necessarily implied in the dissenting opinions in this case.

The rule that a decision must be "read in the dry light of its own facts" and not otherwise, when the question whether it constitutes a precedent arises, is a rule for determining what the language of the decision means; what is decided.

In the Halliburton case it was in discussing the first of the two questions which the court formulated for decision in that case that the language was used which is now relied upon in the dissenting opinions as decisive of this case. That question is set out in the majority opinion but, for easy reference, is restated here:

"First: Were the petitions as presented to the respondent, Secretary of State, legally sufficient to authorize the submission to the voters of this State of an amendment to, or change in the organic law (the Constitution) of this State? Or, in other words, do the petitions embrace in fact a demand for the submission of a constitutional amendment within the contemplation and purview of the initiative amendment adopted in this State in November, 1908, as well as the legislation approved June 12, 1909, providing for the carrying out of such initiative amendment to the Constitution?"

It is not believed that an examination of the language of this question, as thus formulated by the court itself, will lead to the conclusion that this court, when it

290 Mo.—41

framed it, thought it was about to consider and decide the question which it is now contended it did decide. An examination of the briefs shows that the first contention made by respondent was that the proposed amendment to the Constitution was, when judged by its substance, temporary and legislative in character; that the power of the Legislature and of the people, by the initiative, to submit constitutional amendments did not include power to submit, as amendments to the Constitution, matter which was not of permanent sort and of constitutional nature in that sense, but which was in its essence temporary and legislative in nature. Respectable authorities were cited in support of this view. It was not contended a constitutional convention might not include what it would in a proposed constitution, nor that any matter might not be included when the people adopted a new constitution. The contention was that the power to submit amendments was limited, and limited in the manner suggested. The briefs deal with this question at length. Another contention of respondent was that the power to redistrict the State into senatorial districts had been delegated by Section 7 of Article IV of the Constitution and that this delegation bound the people. The argument was that the redistricting could not be done by the people by constitutional amendment until the delegated power had been resumed; under the delegation the power was in the legislative department by force of the Constitution itself, and having been delegated by the people, the people had deprived themselves of the power to do what they provided in the Constitution the delegatee should do. This proposition was argued at length and numerous authorities cited. It did not occur to any lawyer then in the case or on the bench that this last argument in any way depended upon the question whether the conditional power of the three executive officers to redistrict had survived the adoption of Section 57 of Article IV. That question was not gone into by any one connected with the case for the sufficient reason that the argument on this head could not have been af-

fected in any way by the decision of that question. If
the power of these officers was not affected by Section
57, then it remained and the delegation of power re-
mained, literally as stated in Section 7 of Article IV. If
Section 57 of Article IV destroyed the power of these
officials, yet the delegation to the General Assembly re-
mained unaffected except in so far as Section 57 enabled
the people to participate in legislation. The foundation
of the argument of counsel and court, in this respect,
was the fact of the constitutional delegation of the power
to redistrict, which remained the same whether or not
Section 57 affected the conditional power of the three
executive officers. Since the fact that the power was
delegated justified the argument, and that fact remained
the same whether the three officials had or had not been
deprived of their power, then the question whether they
had been so deprived had and could have had no influence
on the decision. This means that the question now con-
tended to have been decided was not in the Halliburton
case and, of course, was not decided in that case. A fair
consideration of that decision, in the light of the rule
first mentioned, it is respectfully submitted, can lead to
no other conclusion.

In concluding Paragraph I of its opinion in the Hal-
liburton case the court holds that the power to redistrict
the State has been delegated and could not be exercised
in the manner proposed until the people by constitutional
amendment had resumed the power by repealing the dele-
gation of it; and holds that the people could not "put in
the Constitution, which is regarded as the organic and
permanent law of the State, mere legislative acts provid-
ing for the exercise of certain powers." The court adds:
"We are unwilling to give our assent to the contention
that these petitions should have been accepted and filed,
whether or not they were applicable to a subject or
matter contemplated by the initiative and referendum."
This last evidently means the same as that which counsel
in the case is quoted as saying in the brief, i. e. that the
initiative-and-referendum amendment had no effect

either way on the two real questions urged upon the court on this phase of the case. And this was and is entirely true. That amendment gave the people no power to propose a constitutional amendment which the Legislature could not have proposed and this fact was in no wise affected by the question whether the power of the executive officers remained or was abrogated by that amendment. The court did refer to that power as still existing, and these remarks are seized upon. In other instances the court specifically named the General Assembly apparently as sole delegatee of the power to redistrict. [Page 437.] If the one is a decision one way, the other is equally a decision to the contrary. The fact is, neither is a decision either way, for the reason stated. When the rule first stated is applied and the facts in the case are kept in mind and the questions for decision, as stated by the court, as presented in the briefs and as finally announced as decided, are considered, it seems that this decision ought not to be misunderstood to the extent that it would be thought to pass upon the question now before this court. We see no reason for refusing to apply to the Halliburton case the same law and rule which is applied to other decisions in determining what they decide and upon what matters they stand as precedents. This rule has stood the test of time. It has received the continuous and unbroken approvel of this court to the present moment. It has universal approval. No reason for its abrogation is advanced. It is merely overlooked in the dissents. When this established rule is applied and the decision tested by it, the argument in the dissents which are based upon the Halliburton and other cases distinguished in the majority opinion seems to us, with due respect to their authors, to be unsound.

Confirmatory of the soundness of this view is another thing. The motion for rehearing in the Halliburton case bears the signature of two able lawyers who subsequently became members of this court. We quote, with approval, from one of the dissenting opinions in this case: "The late John Kennish and the late John C. Brown,

both of whom afterwards served the State with great honor and distinction as members of this court, were of counsel for relator in the Halliburton case." In the motion for rehearing in that case will be found no such conception of the decision as is now suggested in the dissents. In fact, after discussing at length the question as to the discretionary power of the Secretary of State, the motion contains the following:

"The main ground upon which the decision of this court is based in denying the peremptory writ against respondent, is that the proposed constitutional amendment is legislative and not constitutional in character; and that a measure legislative in character cannot be adopted under the guise of being a constitutional amendment. . . . But let us consider what consequences will follow if the court's construction of the initiative-and-referendum amendment is to stand. Under that construction a measure legislative in character and a measure constitutional in character must respectively be proposed as such, and if either should be proposed under the form or guise of the other, it would be void and of no effect, even if adopted by the necessary vote at the polls."

The matter is then argued at length. An examination of this motion fails to disclose that the eminent counsel who represented relator in the Halliburton case suspicioned that the court had decided what it is now insisted it did decide. Their brief shows they did not discover in advance that the question was in the case, and the motion they filed shows they did not discover from the opinion that the court had decided it. Their conceded ability strongly tends to preclude the inference that they overlooked the question which, it is now discovered in the dissents, was the head of the corner in the Halliburton case. If the question whether the conditional redistricting power of the three executive officers had survived the adoption of Section 57 of Article IV was not involved in that case (and we think it is indisputable that it was not) then it was not decided and could not

have been decided. If it was involved as contended, not only court and counsel for respondent, but the distinguished counsel for relator, whose memory we revere and whose reputation for sound thinking is not lightly to be impugned, failed to discover its presence. Also, we have been unable to find that the case has been misunderstood by any annotator or text-writer.

III.   In two of the dissenting opinions it continues to be contended that the rule adopted by the court destroys all restrictions upon the exercise of legislative power, and, from this, it is argued that the construction the court gives the words "the legislative authority" must be incorrect. In substance, the insistence is that the abrogation of these restrictions would lead to results which it is not reasonable to believe the people could have intended. It is conceded, of course, that the court holds the restrictions are not affected, but it is argued that this conclusion cannot be maintained in the face of the holding that "all legislative power" was meant to be included in the words "the legislative authority" as used in the amendment of 1908. With due respect to the opinion of those who advance these arguments in these opinions, we have been unable to escape the conclusion that there is, in the two opinions mentioned, evidence of a confusion of different concepts of legislative power and of the treatment of restrictions upon power and of power itself as identical.

It seems obvious that the distinction between a grant of power and a restriction upon the exercise of a power is so wide that it approaches demonstration in its simple statement. Supererogation would seem to reach its climax in an attempt to argue a thing of such axiomatic character. Nothing need be added to what is said in the court's previous opinion on this subject. The real basis of the continued insistence upon the argument mentioned is the idea of legislative power, as it appears in the two dissents last filed. The meaning given in the

*Margin note: Legislative Power: Absolute and Qualified Exercise: Restrictions.*

court's opinion to the words "legislative authority" as they appear in Section 57 of Article IV is the only meaning of which they seem reasonably susceptible. There is a conception of legislative power which implies absolutism in the sovereign. There is another which conceives it as the full power which might be exercised by the legislative branch of a government of freemen. There is a third which conceives it as the last, less such power as is deducted by constitutional restrictions which the people deem proper for the furtherance of good government but which might be thought not absolutely essential to the existence of free government.

The view that the Bill of Rights withholds certain rights of citizens from the field in which legislation may operate in a government like ours is vindicated by the authorities and by the history of our institutions. [Cooley's Const. Lim. (7 Ed.) p. 65 et seq.] The conception of legislative authority in the mind of the framers and adopters of Section 57 of Article IV of the Constitution could not have been that conception which implies absolute power to legislate unless we convict the people of having forgotten the fundamentals of freedom as they are set forth in the Bill of Rights. It was ordained to protect and preserve them. The main purpose of our government and our Constitution is their protection and preservation. To say that the people, in establishing the State government, forgot these is to say they forgot the things which gave point and purpose to the establishment of a government. It seems safe to conclude that the view of the Bill of Rights taken by the majority opinion is correct and to say the dissenting opinions are not intended to contradict it in that respect.

There are, and in 1908 were, in the Constitution, certain restrictions upon the legislative power, or its exercise, which further limit the subjects to which it may be applied and the manner in which it may be exerted. From the residue of power which is left after the reservations in the Bill of Rights have been deducted from the conception of legislative power as it would appertain to an

absolute monarch, these restrictions make further deductions by means of prohibiting legislative action or forbidding such action except in a prescribed manner. What was left was the legislative power under our Constitution at the time Section 57 was drafted and adopted. The people had no other legislative power or authority in mind, because no other exercisable legislative power then existed in this State. It is clear that the section has in it no suggestion of an intent to create new legislative power, and none that the power which then existed was to be diminished. It dealt with the legislative power as it then was. It neither added to it nor substracted from it. Its language puts this beyond dispute. This is what the majority opinion holds. This is the power which must be and is meant when in the amendment it is said that "the legislative authority of the State shall be vested," etc. It seems manifest that the argument that the words declaring what agencies shall be vested with legislative power destroy restrictions upon legislative power, depends upon the assumption that the legislative power or authority intended to be included in the amendment is not only the legislative power as it then existed and could be exercised under our Constitution, but included all legislative power which could have been exercised by the General Assembly if the Constitution had contained no restrictions upon its activities. This is an assumption of the thing which the argument is designed to prove. This method cannot advance the argument. It may also be suggested that the words of the amendment are entirely general. They name a definite thing and name it as a whole. If they do not include it all, what method is to be adopted in determining the part which is excepted? The language is general and all-embracing. Any idea of exception to it must and does stand in direct contradiction to the words used in the amendment. No amount of argument can hide the all-inclusiveness of the language used, nor explain away the plain contradiction between that language and the thought of exception to it. Nor does the amendment elsewhere contain any suggestion of an exception to its terms.

Amendments are adopted for the express purpose of working changes. It is not the business of courts to explain them away. They are to be interpreted in furtherance of the purpose which actuated the people in their adoption.

The question which remains is whether the power formerly invested by Section 7 of Article IV in the executive officers is legislative power, and that question is fully and correctly discussed and disposed of in the original opinion.

IV. · It is argued that the amendment confines the referendum to "acts of the legislative assembly," and, therefore, it is said, recognizes and excludes from its operation the power of the executive officials under Section 7 of Article IV. If the question here concerned the *referability* of the redistricting measure now in question, the argument referred to would be relevant and, it might be, somewhat persuasive. What relevance it has to the question whether the framers of the measure (the executive officers) had authority to act in the premises is not so apparent.

Referable Acts.

The question whether a measure is an act of the legislative assembly and the question whether the same measure has been promulgated by executive officers without authority are so widely separated that the distinction obtrudes itself and needs no argument.

V. In the opinion of the writer of· this, the opinion prepared by GRAVES, J., convincingly covered every question in the case. It is out of deference to the very earnest and continued insistence, in the two dissents last filed, that the .original ruling is wrong, that a response to new matter and a slightly more detailed discussion of some other questions have been thought proper. With all the respect due the deliberate expression of his views by any member of this court, we have re-examined the legal proposition advanced by our colleagues and have given expression to ·

Conclusion.

our views upon them.    The judgment in this case accords with the intent of the people as expressed in the amendment of 1908.  *Woodson, Graves* and *Walker, JJ.,* concur.